# GROUP LIFE & HEALTH INSURANCE CO., aka BLUE SHIELD OF TEXAS, et al. v. ROYAL DRUG CO., INC., dba ROYAL PHARMACY OF CASTLE HILLS, et al.

No. 77–952.   Argued October 11, 1978—Decided February 27, 1979

STEWART, J., delivered the opinion of the Court, in which WHITE, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which BURGER, C. J., and MARSHALL and POWELL, JJ., joined, *post,* p. 233.

*Keith E. Kaiser* argued the cause for petitioners. With him on the briefs were *J. Burleson Smith, R. Laurence Macon, Richard A. Whiting, Charles R. Shaddox, D. Dudley Oldham, Martin D. Beirne, William R. Pakalka, William C. Church, Jr.,* and *Richard B. Moore.*

*Joel H. Pullen* argued the cause and filed a brief for respondents.

*Richard A. Allen* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General McCree, Assistant Attorney General Shenefield,* and *Barry Grossman.*[*]

———

[*]Briefs of *amici curiae* urging reversal were filed by *Thomas E. Kauper, John A. Fillion, M. Jay Whitman, J. Albert Woll,* and *Laurence Gold* for

Mr. Justice Stewart delivered the opinion of the Court.

The respondents, 18 owners of independent pharmacies in San Antonio, Tex., brought an antitrust action in a Federal District Court against the petitioners, Group Life and Health Insurance Co., known as Blue Shield of Texas (Blue Shield), and three pharmacies also doing business in San Antonio. The complaint alleged that the petitioners had violated § 1 of the Sherman Act, 15 U. S. C. § 1, by entering agreements to fix the retail prices of drugs and pharmaceuticals, and that the activities of the petitioners had caused Blue Shield's policyholders not to deal with certain of the respondents, thereby constituting an unlawful group boycott. The trial court granted summary judgment to the petitioners on the ground that the challenged agreements are exempt from the antitrust laws under § 2 (b) of the McCarran-Ferguson Act, 59 Stat. 34, as amended, 61 Stat. 448, 15 U. S. C. § 1012 (b), because the agreements are the "business of insurance," are "regulated by [Texas] law," and are not "boycotts" within the meaning of § 3 (b) of the Act, 59 Stat. 34, 15 U. S. C.

the International Union, UAW, et al.; by *James W. Rankin* and *Roger G. Wilson* for the Blue Shield Assn.; by *Peter F. Sloss* and *Godfrey L. Munter, Jr.*, for the California Dental Service et al.; by *Chester Inwald* for the District Council 37 Health & Security Plan et al.; by *John H. Pickering, Arnold M. Lerman, C. Loring Jetton, Jr.*, and *William H. Crabtree* for the Motor Vehicle Manufacturers Assn. of the United States, Inc.; and by *Stephen F. Gordon* for the United Federation of Teachers Welfare Fund.

Briefs of *amici curiae* urging affirmance were filed by *William J. Brown*, Attorney General, and *Charles D. Weller* for the State of Ohio; by *Donald A. Randall* and *Jonathan T. Howe* for the Automotive Service Councils, Inc.; by *Richard M. Rindler* and *Phillip A. Proger* for the National Assn. of Retail Druggists; by *A. Stewart Kerr* for the Pharmacists Guild of Michigan; and by *Roger Tilbury* and *Henry Kane* for the Portland Retail Druggists Assn., Inc.

Briefs of *amici curiae* were filed by *Max Thelen, Jr.*, for the Kaiser-Permanente Medical Care Program; and by *Jon S. Hanson, Richard A. Hemmings*, and *David J. Brummond* for the National Assn. of Insurance Commissioners.

§ 1013 (b).[1]  415 F. Supp. 343 (WD Tex.).  The Court of Appeals for the Fifth Circuit reversed the judgment.  Holding that the agreements in question are not the "business of insurance" within the meaning of § 2 (b), the appellate court did not reach the other questions decided by the trial court.  556 F. 2d 1375.  We granted certiorari because of intercircuit conflicts as to the meaning of the phrase "business of insurance" in § 2 (b) of the Act.[2]  435 U. S. 903.

---

[1] The Act provides in relevant part:

"Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

"Sec. 2.  (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

"Sec. 3.  (a) Until June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, . . . and the Act of June 19, 1936, known as the Robinson-Patman Anti-discrimination Act, shall not apply to the business of insurance or to acts in the conduct thereof.

"(b) Nothing contained in this Act shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."  59 Stat. 33–34, as amended, 61 Stat. 448.

[2] The position of the Fifth Circuit is in conflict with that of the Third, Fourth, and District of Columbia Circuits.  See *Frankford Hospital* v. *Blue Cross of Greater Philadelphia,* 554 F. 2d 1253 (CA3 1977); *Anderson* v.

## I

Blue Shield offers insurance policies which entitle the policyholders to obtain prescription drugs. If the pharmacy selected by the insured has entered into a "Pharmacy Agreement" with Blue Shield, and is therefore a participating pharmacy, the insured is required to pay only $2 for every prescription drug. The remainder of the cost is paid directly by Blue Shield to the participating pharmacy. If, on the other hand, the insured selects a pharmacy which has not entered into a Pharmacy Agreement, and is therefore a non-participating pharmacy, he is required to pay the full price charged by the pharmacy. The insured may then obtain reimbursement from Blue Shield for 75% of the difference between that price and $2.

Blue Shield offered to enter into a Pharmacy Agreement with each licensed pharmacy in Texas. Under the Agreement, a participating pharmacy agrees to furnish prescription drugs to Blue Shield's policyholders at $2 for each prescription, and Blue Shield agrees to reimburse the pharmacy for the pharmacy's cost of acquiring the amount of the drug prescribed. Thus, only pharmacies that can afford to distribute prescription drugs for less than this $2 markup can profitably participate in the plan.[3]

---

*Medical Service of District of Columbia,* 551 F. 2d 304 (CA4 1977); *Proctor* v. *State Farm Mutual Automobile Ins. Co.,* 182 U. S. App. D. C. 264, 561 F. 2d 262 (1977).

[3] The *amicus curiae* brief of the United States provides a useful illustration of the operation of the Pharmacy Agreement:

"Suppose the usual and customary retail price for a quantity of Drug X charged both by 'participating' Pharmacy A and 'non-participating' Pharmacy B is $10.00, and the wholesale price (or acquisition cost) to both is $8.00. If an insured buys Drug X from Pharmacy A, the insured pays $2.00. Pharmacy A receives $2.00 from the insured and $8.00 from Blue Shield, or $10.00 total. If an insured buys Drug X from Pharmacy B, the insured pays Pharmacy B $10.00, and receives $6.00 (75 percent of the difference between the retail price and $2.00) from Blue Shield. While

The only issue before us is whether the Court of Appeals was correct in concluding that these Pharmacy Agreements are not the "business of insurance" within the meaning of § 2 (b) of the McCarran-Ferguson Act. If that conclusion is correct, then the Agreements are not exempt from examination under the antitrust laws.[4] Whether the Agreements are *illegal* under the antitrust laws is an entirely separate question, not now before us.[5]

## II

### A

As the Court stated last Term in *St. Paul Fire & Marine Ins. Co.* v. *Barry,* 438 U. S. 531, 541,[6] the starting point in a case involving construction of the McCarran-Ferguson Act, like the starting point in any case involving the meaning of a statute, is the language of the statute itself. See also *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (POWELL, J., concurring). It is important, therefore, to observe at the outset that the statutory language in question

---

Pharmacy B receives the same as Pharmacy A, the insured must pay $4.00 for the drug and also must take steps to obtain reimbursement.

"If the pharmacy's acquisition cost for the drug is $5.00 rather than $8.00, the situations of Pharmacy B and the insured are unchanged. But now Pharmacy A will receive only $5.00 from Blue Shield, for a total of $7.00."

[4] Even if they are the "business of insurance," the Agreements are exempt from the antitrust laws only if they are also "regulated by State law" within the meaning of § 2 (b) and not "boycotts" or other conduct described by § 3 (b). See n. 1, *supra.* See also *St. Paul Fire & Marine Ins. Co.* v. *Barry,* 438 U. S. 531.

[5] It is axiomatic that conduct which is not exempt from the antitrust laws may nevertheless be perfectly legal. The United States in its *amicus* brief urging affirmance has taken the position that the Pharmacy Agreements probably do not violate the antitrust laws, though recognizing that that issue is not presented here.

[6] The issue in that case was the meaning of the "boycott" exception in § 3 (b) of the Act. The issue here, the meaning of the "business of insurance" exemption in § 2 (b) of the Act, was not before the Court.

here does not exempt the business of insurance companies from the scope of the antitrust laws. The exemption is for the "business of insurance," not the "business of insurers":

> "The statute did not purport to make the States supreme in regulating all the activities of insurance *companies;* its language refers not to the persons or companies who are subject to state regulation, but to laws 'regulating the *business* of insurance.' Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the statute apply." *SEC* v. *National Securities, Inc.,* 393 U. S. 453, 459–460. (Emphasis in original.)

Since the law does not define the "business of insurance," the question for decision is whether the Pharmacy Agreements fall within the ordinary understanding of that phrase, illumined by any light to be found in the structure of the Act and its legislative history. Cf. *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 199, and n. 19.

### B

The primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk. "It is characteristic of insurance that a number of risks are accepted, some of which involve losses, and that such losses are spread over all the risks so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it." 1 G. Couch, Cyclopedia of Insurance Law § 1:3 (2d ed. 1959). See also R. Keeton, Insurance Law § 1.2 (a) (1971) ("Insurance is an arrangement for transferring and distributing risk"); 1 G. Richards, The Law of Insurance § 2 (W. Freedman 5th ed. 1952).[7]

---

[7] Webster's New International Dictionary of the English Language 1289 (unabr. 2d ed. 1958) defines insurance as:

"Act of insuring, or assuring, against loss or damage by a contingent event; a contract whereby, for a stipulated consideration, called a *premium,*

The significance of underwriting or spreading of risk as an indispensable characteristic of insurance was recognized by this Court in *SEC* v. *Variable Annuity Life Ins. Co.,* 359 U. S. 65. That case involved several corporations, representing themselves as "life insurance" companies, that offered variable annuity contracts for sale in interstate commerce. The companies were regulated by the insurance commissioners of several States. Purchasers of the contracts were not entitled to any fixed return, but only to a pro rata participation in the investment portfolios of the companies. Thus a policyholder could receive substantial sums if investment decisions were successful, but very little if they were not. One of the questions presented was whether these variable annuity contracts were the "business of insurance" under § 2 (b) of the McCarran-Ferguson Act.[8] The Court held that the annuity contracts were not insurance, even though they were regulated as such under state law and involved actuarial prognostications of mortality. Central to the Court's holding was the premise that "the concept of 'insurance' involves some investment risk-taking on the part of the company." 359 U. S., at 71. Since the variable annuity contracts offered no guarantee of fixed income, they placed all the investment risk on the annuitant and none on the company. *Ibid.* The Court concluded, therefore, that the annuities involved "no true underwriting of risks, the one earmark of insurance as it has commonly been conceived of in popular understanding and usage." *Id.,* at 73 (footnote omitted). Cf. *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, 412 ("The effect of insurance—indeed

one party undertakes to indemnify or guarantee another against loss by a certain specified contingency or peril, called a *risk,* the contract being set forth in a document called the *policy* . . . ."

[8] The issue in *SEC* v. *Variable Annuity Life Ins. Co.* was whether the variable annuity contracts were subject to regulation under the Securities Act of 1933 and the Investment Company Act of 1940. The Court held that the contracts were subject to such regulation as securities since they were not "insurance" or "annuity" policies specifically exempt

it has been said to be its fundamental object—is to distribute the loss over as wide an area as possible").

The petitioners do not really dispute that the underwriting or spreading of risk is a critical determinant in identifying insurance. Rather they argue that the Pharmacy Agreements do involve the underwriting of risks. As they state in their brief:

> "In *Securities and Exchange Commission* v. *Variable Annuity Life Insurance Co.*, 359 U. S. 65, 73 (1959), the 'earmark' of insurance was described as the 'underwriting of risks' in exchange for a premium. Here the risk insured against is the possibility that, during the term of the policy, the insured may suffer a financial loss arising from the purchase of prescription drugs, or that he may be financially unable to purchase such drugs. In consideration of the premium, Blue Shield assumes this risk by agreeing with its insureds to contract with Participating Pharmacies to furnish the needed drugs and to reimburse the Pharmacies for each prescription filled for the insured. In short, each of the fundamental elements of insurance is present here—the payment of a premium in exchange for a promise to indemnify the insured against losses upon the happening of a specified contingency."

The fallacy of the petitioners' position is that they confuse the obligations of Blue Shield under its insurance policies, which insure against the risk that policyholders will be unable to pay for prescription drugs during the period of coverage, and the agreements between Blue Shield and the participating pharmacies, which serve only to minimize the costs Blue Shield incurs in fulfilling its underwriting obligations.[9] The

---

from the Securities Act, and because they were not the "business of insurance" within the meaning of the McCarran-Ferguson Act.

[9] It is true that some type of provider agreement is necessary for a service benefit plan to exist. But it does not follow that because an agree-

benefit promised to Blue Shield policyholders is that their premiums will cover the cost of prescription drugs except for a $2 charge for each prescription.[10] So long as that promise is kept, policyholders are basically unconcerned with arrangements made between Blue Shield and participating pharmacies.[11]

The Pharmacy Agreements thus do not involve any underwriting or spreading of risk, but are merely arrangements for the purchase of goods and services by Blue Shield. By agreeing with pharmacies on the maximum prices it will pay for drugs, Blue Shield effectively reduces the total amount it must pay to its policyholders. The Agreements thus enable Blue Shield to minimize costs and maximize profits. Such cost-savings arrangements may well be sound business practice, and may well inure ultimately to the benefit of policyholders in the form of lower premiums, but they are not the "business of insurance." [12]

---

ment is necessary to provide insurance, it is also the "business of insurance." Assume, for example, that an indemnity insurer must have a line of credit or other commercial arrangement with a bank in order to pay off monetary claims. Despite the fact that the line of credit is "necessary" for the insurer to fulfill its obligations, it is nevertheless not the "business of insurance."

[10] Thus, the benefit promised to Blue Shield policyholders under the policy is that they "shall be required to pay no more than the drug deductible for each of such covered drugs."

[11] As the Court of Appeals stated:

"Blue Shield's policyholders are basically unconcerned with the contract between the insurer and the Participating Pharmacy. They are obligated to pay a Participating Pharmacy two dollars ($2.00) for a prescription regardless of the presence or absence of a price fixing arrangement. Thus, by minimizing costs and maximizing profits, the Participating Pharmacy Agreements inure principally to the benefit of Blue Shield." 556 F. 2d 1375, 1381.

[12] As the United States points out in its *amicus* brief, there is an important distinction between risk underwriting and risk reduction. By reducing the total amount it must pay to policyholders, an insurer reduces

The Pharmacy Agreements are thus legally indistinguishable from countless other business arrangements that may be made by insurance companies to keep their costs low and thereby also keep low the level of premiums charged to their policyholders. Suppose, for example, that an insurance company entered into a contract with a large retail drug chain whereby its policyholders could obtain drugs under their policies only from stores operated by this chain. The justification for such an agreement would be administrative and bulk-purchase savings resulting from obtaining all of the company's drug needs from a single dealer. Even though these cost savings might ultimately be reflected in lower premiums to policyholders, would such a contract be the "business of insurance"? Or suppose that the insurance company should decide to acquire the chain of drug stores in order to lower still further its costs of meeting its obligations to its policyholders. Such an acquisition would surely not be the "business of insurance." *SEC* v. *National Securities, Inc.,* 393 U. S. 453.[13]

C

Another commonly understood aspect of the business of insurance relates to the contract between the insurer and the insured. In enacting the McCarran-Ferguson Act Congress was concerned with:

"The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpreta-

___

its liability and therefore its risk. But unless there is some element of spreading risk more widely, there is no underwriting of risk.

[13] In *National Securities,* the Arizona Director of Insurance approved, pursuant to statute, a merger between two insurance companies. This Court held, however, that the Arizona statute was not enacted for the purpose of regulating the "business of insurance." 393 U. S., at 460. If a merger between two insurance companies is not the "business of insurance," then an acquisition by an insurer of a manufacturer or a retail chain, although conceptually indistinguishable from the Pharmacy Agreements in this case, is also not the "business of insurance."

tion, and enforcement—these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder." *SEC* v. *National Securities, Inc., supra,* at 460.

The Pharmacy Agreements are not "between insurer and insured." They are separate contractual arrangements between Blue Shield and pharmacies engaged in the sale and distribution of goods and services other than insurance.

The petitioners argue that nonetheless the Pharmacy Agreements so closely affect the "reliability, interpretation, and enforcement" of the insurance contract and "relate so closely to their status as reliable insurers" as to fall within the exempted area.[14] This argument, however, proves too much.

At the most, the petitioners have demonstrated that the Pharmacy Agreements result in cost savings to Blue Shield which may be reflected in lower premiums if the cost savings are passed on to policyholders. But, in that sense, every business decision made by an insurance company has some impact on its reliability, its ratemaking, and its status as a

---

[14] The petitioners argue that the absence of the Pharmacy Agreements "which permit the insured to obtain drugs on the terms and for the amounts stated in the policies would constitute a breach of the contract of insurance." But the benefit Blue Shield provides its policyholders is the assurance that they can obtain drugs in return for a direct maximum payment of $2 for each prescription. The Pharmacy Agreements are separate contractual arrangements between Blue Shield and certain pharmacists fixing the cost Blue Shield will pay for drugs. The wholly separate nature of the two categories of agreements is in no way affected by the fact that the Pharmacy Agreements are indirectly referred to in the insurance policies.

reliable insurer. The manager of an insurance company is no different from the manager of any enterprise with the responsibility to minimize costs and maximize profits. If terms such as "reliability" and "status as a reliable insurer" were to be interpreted in the broad sense urged by the petitioners, almost every business decision of an insurance company could be included in the "business of insurance." Such a result would be plainly contrary to the statutory language, which exempts the "business of insurance" and not the "business of insurance companies."

## III

### A

The conclusion that the Pharmacy Agreements are not the "business of insurance" is fully confirmed by the legislative history of the McCarran-Ferguson Act. The law was enacted in 1945 in response to this Court's decision in *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533. The indictment in that case charged that the defendants had conspired to fix insurance rates and commissions, and had conspired to boycott and coerce noncooperating insurers, agents, and insureds. In the District Court the defendants had successfully demurred to the indictment on the ground that the insurance industry was not a part of interstate commerce subject to regulation under the Commerce Clause.[15] On direct appeal, this Court reversed the judgment, holding that the business of insurance is interstate commerce, and that the Congress which enacted the Sherman Act had not intended to exempt the insurance industry from its coverage.

### B

The primary concern of Congress in the wake of that decision was in enacting legislation that would ensure that

---

[15] Since the leading case of *Paul* v. *Virginia*, 8 Wall. 168, 183, it had been understood that "[i]ssuing a policy of insurance is not a transaction of commerce."

218

the States would continue to have the ability to tax and regulate the business of insurance.[16] This concern is reflected in §§ 1 and 2 (a) of the Act,[17] neither of which is involved in this case. A secondary concern was the applicability of the antitrust laws to the insurance industry.[18] Months before

---

[16] S. Rep. No. 20, 79th Cong., 1st Sess., 2 (1945); H. R. Rep. No. 143, 79th Cong., 1st Sess., 2–3 (1945). The problem was that if insurance was interstate commerce, then the constitutionality of state regulation and taxation would be questionable. As the House Report stated:

"Inevitable uncertainties . . . followed the handing down of the decision in the *Southeastern Underwriters Association* case . . . .

"[Y]our committee believes there is urgent need for an immediate expression of policy by the Congress with respect to the continued regulation of the business of insurance by the respective States. Already many insurance companies have refused, while others have threatened refusal to comply with State tax laws, as well as with other State regulations, on the ground that to do so, when *such laws may subsequently be held unconstitutional* in keeping with the precedent-smashing decision in the *Southeastern Underwriters case*, will subject insurance executives to both civil and criminal actions for misappropriation of company funds." *Ibid.* (Emphasis added.)

[17] See text of statute at n. 1, *supra.*

[18] There is no question that the *primary* purpose of the McCarran-Ferguson Act was to preserve state regulation of the activities of insurance companies, as it existed before the *South-Eastern Underwriters* case. The power of the States to regulate and tax insurance companies was threatened after that case, because of its holding that insurance companies are in interstate commerce. The McCarran-Ferguson Act operates to assure that the States are free to regulate insurance companies without fear of Commerce Clause attack. The question in the present case, however, is one under the quite different *secondary* purpose of the McCarran-Ferguson Act—to give insurance companies only a limited exemption from the antitrust laws.

The repeated insistence in the dissenting opinion that the McCarran-Ferguson Act should be read as protecting the right of the States to regulate what they traditionally regulated is thus entirely correct—and entirely irrevelant to the issue now before the Court. See n. 38, *infra.* For the question here is not whether the McCarran-Ferguson Act made state regulation of these Pharmacy Agreements exempt from attack under

this Court's decision in *South-Eastern Underwriters* was announced, proposed legislation to totally exempt the insurance industry from the Sherman and Clayton Acts had been introduced in Congress.[19] Less than three weeks after the actual decision, the House of Representatives passed a bill which would also have provided the insurance industry with a blanket exemption from the antitrust laws, thus restoring the state of law that had existed before the decision in *South-Eastern Underwriters*.[20]

Congress, however, rejected this approach.[21] Instead of a total exemption, Congress provided in § 2 (b) that the antitrust laws "shall be applicable" unless the activities of insurance companies are the business of insurance and regulated by state law. Moreover, under § 3 (b) the Sherman Act was made applicable in any event to acts of boycott, coercion, or intimidation. To allow the States time to adjust to the applicability of the antitrust laws to the insurance industry,

the Commerce Clause. It is the quite different question whether the Pharmacy Agreements are exempt from the antitrust laws.

In short, the McCarran-Ferguson Act freed the States to continue to regulate and tax the business of insurance companies, in spite of the Commerce Clause. It did not, however, exempt the business of insurance companies from the antitrust laws. It exempted only "the business of insurance." See *SEC* v. *National Securities, Inc.*, 393 U. S. 453.

[19] H. R. 3270, 78th Cong., 1st Sess. (1943); S. 1362, 78th Cong., 1st Sess. (1943). These bills would have provided that nothing in the Sherman or Clayton Acts "shall be construed to apply to the business of insurance or to acts in the conduct of that business or in any wise to impair the regulation of that business by the several States."

[20] 90 Cong. Rec. 6565 (1944).

[21] The total exemption bill failed in the Conference Committee because of a fear that it could not pass in the Senate and in any event would be vetoed by the President. 91 Cong. Rec. 1087 (1945) (remarks of Rep. Hancock). Also important was the opposition of the National Association of Insurance Commissioners to a blanket antitrust exemption. 90 Cong. Rec. 8482 (1944).

Congress imposed a 3-year moratorium.[22] After the expiration of the moratorium on July 1, 1948, however, Congress clearly provided that the antitrust laws would be applicable to the business of insurance "to the extent that such business is not regulated by State law." [23]

By making the antitrust laws applicable to the insurance industry except as to conduct that is the business of insurance, regulated by state law, and not a boycott, Congress did not intend to and did not overrule the *South-Eastern Underwriters* case.[24] While the power of the States to tax and regulate insurance companies was reaffirmed, the McCarran-Ferguson Act also established that the insurance industry would no longer have a blanket exemption from the antitrust laws. It is true that § 2 (b) of the Act does create a partial exemption from those laws. Perhaps more significantly, however, that section, and the Act as a whole, embody a legislative rejection of the concept that the insurance industry is outside the scope of the antitrust laws—a concept that had prevailed before the *South-Eastern Underwriters* decision.

## C

References to the meaning of the "business of insurance" in the legislative history of the McCarran-Ferguson Act

---

[22] See n. 1, *supra.* The purpose of the moratorium was to allow the States three years to take steps to regulate the business of insurance. 91 Cong. Rec. 1443 (1945) (remarks of Sen. McCarran).

[23] *Ibid.* (remarks of Sen. Ferguson); McCarran, Federal Control of Insurance: Moratorium Under Public Law 15 Expired July 1, 34 A. B. A. J. 539, 540 (1948).

[24] That Congress did not intend to restore the law to what it had been before *South-Eastern Underwriters* is made dramatically clear in the following exchange between Senator McKellar and Senator Ferguson:

"Mr. McKELLAR. As I understand the bill its purpose and effect will be to establish the law as it was supposed to be prior to the rendering of the recent opinion of the Supreme Court of the United States. Is that correct?

"Mr. FERGUSON. No." 91 Cong. Rec. 478 (1945).

See also *id.,* at 1444 (exchange between Sens. Pepper and McCarran).

strongly suggest that Congress understood the business of insurance to be the underwriting and spreading of risk. Thus, one of the early House Reports stated: "The theory of insurance is the distribution of risk according to hazard, experience, and the laws of averages. These factors are not within the control of insuring companies in the sense that the producer or manufacturer may control cost factors." H. R. Rep. No. 873, 78th Cong., 1st Sess., 8–9 (1943).[25] See also S. Rep. No. 1112, 78th Cong., 2d Sess., 6 (1944); 90 Cong. Rec. 6526 (1944) (remarks of Rep. Hancock).

Because of the widespread view that it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation, the primary concern of both representatives of the insurance industry and the Congress was that cooperative ratemaking efforts be exempt from the antitrust laws. The passage of the McCarran-Ferguson Act was preceded by the introduction in the Senate Committee of a report and a bill submitted by the National Association of Insurance Commissioners on November 16, 1944.[26] The views of the NAIC are particularly significant, because the Act ultimately passed was based in large part on the NAIC bill.[27] The report emphasized that the concern of the insurance commissioners was that smaller enterprises and insurers other than life insurance companies were unable to underwrite risks accurately, and it therefore concluded:

> "For these and other reasons this subcommittee believes it would be a mistake to permit or require the unrestricted competition contemplated by the antitrust laws to apply to the insurance business. *To prohibit com-*

---

[25] The recognition by Congress that the ability to control costs was not within the ability of insurance companies is further evidence that the Pharmacy Agreements, which are solely designed to minimize costs, are not insurance.

[26] 90 Cong. Rec. A4403–4408 (1944).

[27] 91 Cong. Rec. 483 (1945) (remarks of Sen. O'Mahoney).

*bined efforts for statistical and rate-making purposes would be a backward step in the development of a progressive business.* We do not regard it as necessary to labor this point any further because Congress itself recently recognized *the necessity for concert of action in the collection of statistical data and rate making* when it enacted the District of Columbia Fire Insurance Rating Act." *Id.,* at A4405 (emphasis added).

The bill proposed by the NAIC enumerated seven specific practices to which the Sherman Act was not to apply.[28]   Each of the specific practices involved intra-industry cooperative or concerted activities.   None involved contractual arrangements that insurance companies might make with providers of goods or services to reduce the costs to the companies of meeting their underwriting obligations to their policyholders.[29]

---

[28] 90 Cong. Rec. A4406 (1944).   This specific list of exempted activities was not included in the law ultimately enacted.

[29] The dissenting opinion makes the argument that because Congress rejected bills that would have limited the "business of insurance" to a specific list of insurance company practices, Congress intended that the exemption it finally enacted be interpreted "broadly." Precisely the opposite is true.

At the time Congress was considering one of the early versions of the Act, H. R. 3270, 78th Cong., 1st Sess. (1943), which would have wholly exempted from the antitrust laws "the business of insurance or . . . acts in the conduct of that business," an amendment was introduced which would have exempted specific activities.   90 Cong. Rec. 6561 (1944).   The proponent of the amendment, Representative Anderson, explained that its purpose was to provide broader protection than provided by H. R. 3270: "But I say to this House that some legislation should be passed which asserts the right of the States to control the questions of risks, rates, premiums, commissions, policies, investments, reinsurance, capital requirements, and items of that nature.   It is for that purpose I have insisted upon bringing this at this time to the attention of the House.   If you pass H. R. 3270 as it now stands and go back home and any of your insurance friends ask you what you did to safeguard the protection of insurance by the State, you must answer them in all truth that all you did was to pass

The floor debates also focused simply on whether cooperative ratemaking should be exempt. Thus, Senator Ferguson, in explaining the purpose of the bill, stated:

"This bill would permit—and I think it is fair to say that it is intended to permit—rating bureaus, because in the last session we passed a bill for the District of Columbia allowing rating. What we saw as wrong was the fixing of rates without statutory authority in the States; but we believe that State rights should permit a State to say that it believes in a rating bureau. I think the insurance companies have convinced many members of the legislature that we cannot have open competition in fixing rates on insurance. If we do, we shall have chaos. There will be failures, and failures always follow losses." 91 Cong. Rec. 1481 (1945).

The consistent theme of the remarks of other Senators also indicated a primary concern that cooperative ratemaking would be protected from the antitrust laws. *Id.*, at 1444 and 1485 (remarks of Sen. O'Mahoney); 485 (remarks of Sen. Taft).[30] President Roosevelt, in signing the bill, also em-

---

a bill which provided antitrust protection for companies now under indictment."

The amendment was defeated. 90 Cong. Rec. 6562 (1944).

Thus, Congress rejected an amendment which exempted specific activities of insurance companies (not including anything remotely resembling the Pharmacy Agreements in this case) which was perceived to be broader than H. R. 3270. Since H. R. 3270 was itself broader than the Act as eventually enacted, it necessarily follows that the exemption of the Act is narrower than the bills which would have exempted specific practices. This pattern is consistent with the entire legislative history of the McCarran-Ferguson Act, which was characterized by a continual narrowing of the original blanket exemption.

[30] The dissenting opinion states that the "compelling explanation" for the lack of discussion of provider agreements in the legislative history was the congressional concern about fire insurance companies. *Post*, at 234 n. 2. However, input from all types of insurance companies was sought through

phasized that the bill would allow cooperative rate regulation. He stated that "Congress did not intend to permit private rate fixing, which the Antitrust Act forbids, but was willing to permit actual regulation of rates by affirmative action of the States." S. Rosenman, The Public Papers and Addresses of Franklin D. Roosevelt, 1944–1945 Vol., p. 587 (1950).[31] There is not the slightest suggestion in the legislative history that Congress in any way contemplated that arrangements such as the Pharmacy Agreements in this case, which involve the mass purchase of goods and services from entities outside the insurance industry, are the "business of insurance." [32]

---

the Insurance Commissioners of the various States "because the Commissioners were aware of the chaotic condition which exists at the present time." 91 Cong. Rec. 484 (1945) (remarks of Sen. Ferguson). Moreover, the National Association of Insurance Commissioners, whose concern was surely not limited to fire insurance, was certainly aware of provider agreements since it drafted model state enabling legislation to govern service-benefit health plans. But this Association, which played a major role in the drafting of the McCarran-Ferguson Act, did not include provider agreements in its proposed bill exempting specific practices of insurance companies from the scope of the antitrust laws. 90 Cong. Rec. A4406 (1944). Given this background, the failure of Congress to mention provider agreements, or anything in any way resembling them, suggests that Congress did not intend that provider agreements were to be exempt.

[31] The dissenting opinion states that the *National Securities* case recognized that the legislative history of the Act "sheds little light" on the meaning of the "business of insurance." *Post,* at 234. In *National Securities,* however, the Court went on to state that the legislative history indicated that "Congress was mainly concerned with the relationship between insurance ratemaking and the antitrust laws, and with the power of the States to tax insurance companies." 393 U. S., at 458–459.

[32] One question not resolved by this legislative history is which of the various practices alleged in the *South-Eastern Underwriters* indictment Congress intended to be covered by the phrase "business of insurance." The indictment in that case had charged, for example, that the defendants had fixed their agents' commissions as well as premium rates. It is clear from the legislative history that the fixing of rates is the "business of

# D

At the time of the enactment of the McCarran-Ferguson Act, corporations organized for the purpose of providing their

insurance." The same conclusion does not so clearly emerge with respect to the fixing of agents' commissions.

The bills introduced before the *South-Eastern Underwriters* decision which would have totally exempted the insurance industry from the anti-trust laws specifically included agreements regarding agents' commissions as an exempt practice. *E. g.*, H. R. 4444, 78th Cong., 2d Sess. (1944). Similarly, the bill proposed by the National Association of Insurance Commissioners two months after the *South-Eastern Underwriters* case was decided would have also exempted agents' commissions. 90 Cong. Rec. A4406 (1944). The subsequent bill that followed the approach of the NAIC and exempted specific activities, however, was limited to traditional underwriting activities and made no mention of agreements with insurance agents:

§ 4 (b). "On and after March 1, 1946, the provisions of said Sherman Act shall not apply to any agreement or concerted or cooperative action between two or more insurance companies for making, establishing, or using rates for insurance, rating methods, premiums, insurance policy or bond forms, or underwriting rules . . . ." S. 12, 79th Cong., 1st Sess. (1945).

One inference that can be drawn from this pattern is that Congress was aware of the existence of agreements regarding agents' commissions, and chose not to include them within the exemption for the "business of insurance." On the other hand, the fact that the indictment in *South-Eastern Underwriters* had included a charge that insurance companies did boycott agents who insisted on selling other lines of insurance, together with the fact that § 3 (b) presumably removes an exemption that, but for its absence, would be conferred by § 2, suggests that the "business of insurance" may have been intended to include dealings within the insurance industry between insurers and agents.

Even if it be assumed, however, that transactions between an insurer and its agents, including independent agents, are the "business of insurance," it still does not follow that the Pharmacy Agreements also fall within the definition. Transactions between an insurer and an agent, unlike the Pharmacy Agreements, are wholly intra-industry; an insurance agent sells insurance while a pharmacy sells goods and services. Moreover, there are historical reasons why the Pharmacy Agreements should not be considered the "business of insurance," whatever may be the status of agreements between an insurer and its agents. See Part III–D, *infra*.

members with medical services and hospitalization were not considered to be engaged in the insurance business at all, and thus were not subject to state insurance laws. *E. g., Jordan* v. *Group Health Assn.,* 71 App. D. C. 38, 107 F. 2d 239 (1939); *California Physicians' Service* v. *Garrison,* 155 P. 2d 885 (Cal. App. 1945). aff'd, 28 Cal. 2d 790, 172 P. 2d 4 (1946); *Commissioner of Banking & Insurance* v. *Community Health Service,* 129 N. J. L. 427, 30 A. 2d 44 (1943); *State ex rel. Fishback* v. *Universal Service Agency,* 87 Wash. 413, 151 P. 768 (1915).[33] Similarly, States which regulated prepaid health-service plans at the time the Act was enacted either exempted them from the requirements of the state insurance code or provided that they "shall not be construed as being engaged in the business of insurance" under state law. Rorem, Enabling Legislation for Non-Profit Hospital Service Plans, 6 Law & Contemp. Prob. 528, 534 (1939).[34] Since the legisla-

---

[33] The only case to the contrary was *Cleveland Hospital Service Assn.* v. *Ebright,* 142 Ohio St. 51, 49 N. E. 2d 929 (1943). There have been few cases dealing with the issue since the enactment of the McCarran-Ferguson Act; most of them have also held that Blue Cross and Blue Shield plans are not insurance. See, *e. g., Michigan Hospital Service* v. *Sharpe,* 339 Mich. 357, 63 N. W. 2d 638 (1954); *Hospital Service Corp.* v. *Pennsylvania Ins. Co.,* 101 R. I. 708, 227 A. 2d 105 (1967).

[34] The dissenting opinion argues that "regulation of the service-benefit plans was a part of the system of state regulation of insurance that the McCarran-Ferguson Act was designed to preserve." *Post,* at 240. It is not at all clear that States that passed enabling statutes regarded the plans as insurance. These statutes typically authorized the plans to operate but did not specify whether or not they were insurance. *E. g.,* 1935 Ill. Laws, p. 621 ("An Act to provide for the Incorporation and Regulation of non-profit Hospital Service Corporations"); 1939 Mich. Pub. Acts No. 109 ("An Act to provide for and to regulate the incorporation of non-profit hospital service corporations"); 1938 N. J. Laws, ch. 336 ("An Act concerning hospital service corporations and regulating the establishment, maintenance and operation of hospital service plans"); ch. 698, 53 Stat. 1412 (1939) ("Providing for the incorporation of certain persons as Group Hospitalization, Inc."). This latter statute enacted by Congress also pro-

tive history makes clear that Congress certainly did not intend the definition of the "business of insurance" to be *broader* than its commonly understood meaning, the contemporary perception that health-care organizations were not engaged in providing insurance is highly significant in ascertaining congressional intent.

The *Jordan* v. *Group Health Assn.* case, *supra,* is illustrative of the contemporary view of health-care plans. Group Health was organized as a nonprofit corporation to provide various medical services and supplies to members who paid a fixed annual premium. To implement the plan, Group Health contracted with physicians, hospitals, and others, to provide medical services. These groups were compensated exclusively by Group Health. By contracting with the various medical groups directly, Group Health was able to obtain

vided in § 7: "This corporation shall not be subject to the provisions of statutes regulating the business of insurance in the District of Columbia, but shall be exempt therefrom unless specifically designated therein." The Senate Report stated: "This bill does not change existing law but merely creates a private corporation which did not heretofore exist in the District of Columbia." S. Rep. No. 1012, 76th Cong., 1st Sess., 2 (1939). At the time this statute was passed in 1939, the group health services plan in the District of Columbia had been construed not to be engaged in the business of insurance. *Group Health Assn.* v. *Moor,* 24 F. Supp 445 (DC 1938).

Indeed, courts have continued to hold that Blue Shield plans are not insurance even in States that have enacted enabling statutes. *E. g., Michigan Hospital Service* v. *Sharpe, supra.* In that case, the court specifically rejected the proposition that the existence of the enabling statute was sufficient to demonstrate that the plan was insurance.

But even if certain aspects of a Blue Shield plan are the "business of insurance," the Pharmacy Agreements in this case are not—for all the reasons set out in this opinion. It is to be emphasized that the question whether provider agreements like the Pharmacy Agreements in this case, or other aspects of insurance companies, were in 1945 or are now regulated by state law is irrelevant to the issue before the Court in the present case. See n. 38, *infra.*

228

services at a lower cost than if each member contracted separately. The plan, therefore, was somewhat similar to the Pharmacy Agreements in this case. The court in *Group Health* held that this type of arrangement was not insurance:

"Whether the contract is one of insurance or of indemnity there must be a risk of loss to which one party may be subjected by contingent or future events and an assumption of it by legally binding arrangement by another. Even the most loosely stated conceptions of insurance . . . require these elements. Hazard is essential and equally so a shifting of its incidence.

.        .        .        .        .

"Although Group Health's activities may be considered in one aspect as creating security against loss from illness or accident, more truly they constitute the quantity purchase of well-rounded, continuous medical service by its members. Group Health is in fact and in function a consumer cooperative. The functions of such an organization are not identical with those of insurance or indemnity companies. The latter are concerned primarily, if not exclusively, with risk . . . . On the other hand, the cooperative is concerned principally with *getting service rendered to its members* and doing so at lower prices made possible by quantity purchasing and economies in operation." 71 App. D. C., at 44, 46, 107 F. 2d, at 245, 247. (Emphasis supplied in part; footnotes omitted.) [35]

---

[35] Despite the fact that courts did not view plans like Blue Cross and Blue Shield as insurance at the time of the passage of the McCarran-Ferguson Act, the petitioners argue that Attorney General Biddle's remarks when testifying in the Joint Hearing before the Subcommittees of the Committees on the Judiciary on S. 1362, H. R. 3269, and H. R. 3270, 78th Cong., 1st Sess., 41–42 (1943), indicate a congressional understanding that such plans were indeed insurance.

The thrust of Attorney General Biddle's remarks was that this Court's decision in *American Medical Assn.* v. *United States,* 317 U. S. 519,

Indeed, Blue Cross and Blue Shield organizations themselves have historically taken the position that they are not insurance companies in seeking to avoid state regulation and taxation.[36] It is thus difficult to assume that contrary to this historical position and a majority of court decisions, Congress in 1945 understood that advance-payment medical-

---

justified the indictment in the *South-Eastern Underwriters* case. In the *AMA* case, the Court had held that a health-maintenance organization was engaged in "trade" within the meaning of the Sherman Act. Based on this decision, Attorney General Biddle expressed the view that the plan was insurance and that therefore the Court had already held that insurance was commerce. Thus, he argued that the indictment in *South-Eastern Underwriters* was proper.

It seems clear, however, why this testimony does not demonstrate that Congress believed that Blue Cross or Blue Shield plans are insurance. First, the statement of the Attorney General that the plan in the *AMA* case was insurance was not accepted by Congress. Senator Bailey rejected the characterization, pointing out that the Court had not referred to the plan as insurance. To Senator Bailey, the plan was not insurance but a "group cooperative movement." (Indeed, the precise plan at issue was held not to be insurance in *Jordan* v. *Group Health Assn.*, 71 App. D. C. 38, 107 F. 2d 239 (1939).) But even if it can nonetheless be inferred that some Members of Congress may have agreed with the Attorney General that prepaid health plans are insurance, his testimony did not remotely suggest that agreements between an insurer and a third party fixing the cost at which goods and services will be purchased is also insurance.

Similarly, the fact that a few years later some witnesses at a Senate Committee hearing referred to Blue Cross as insurance in discussing alternatives to national health insurance, *e. g.*, Hearings before the Senate Committee on Education and Labor on S. 1606, 79th Cong., 2d Sess., pt. 1, pp. 172–176 (1946), does not establish that Congress shared this view, let alone that provider agreements like the Pharmacy Agreements in this case are insurance.

[36] Weller, The McCarran-Ferguson Act's Antitrust Exemption for Insurance: Language, History and Policy, 1978 Duke L. J. 587, 624 n. 174. As one commentator has stated about the effectiveness of the traditional opposition of these organizations to being characterized as insurance:

"[I]nsurance experts are fond of expressing amazement at Blue Cross and Blue Shield opinion that the Blues are not insurance but something else, such as 'pre-payment plans.' The insurance experts should control their

230

benefits plans are the "business of insurance." [37] It is next to impossible to assume that Congress could have thought that agreements (even by insurance companies) which provide for the purchase of goods and services from third parties at a set price are within the meaning of that phrase.[38]

incredulity of this view, or at least save some for the courts. For the fact is that the majority of cases have in effect upheld these so-called 'outrageous' opinions of Blue Cross adherents." Denenberg, The Legal Definition of Insurance, 30 J. Ins. 319, 322 (1963).

[37] This is not to say that the contracts offered by Blue Shield to its policyholders, as distinguished from its provider agreements with participating pharmacies, may not be the "business of insurance" within the meaning of the Act.

[38] This conclusion is in no way affected by the existence of state enabling statutes regulating advance-payment medical-benefits plans at the time the McCarran-Ferguson Act was enacted. *E. g.,* 1937 Cal. Stats., ch. 882, as amended by 1941 Cal. Stats., ch. 311; 1939 Conn. Pub. Acts, ch. 150; 1935 Ill. Laws, p. 621; 1936 Miss. Gen. Laws, ch. 177; 1939 Mich. Pub. Acts, No. 109; 1938 N. J. Laws, ch. 719. These statutes generally provided that the plans were not insurance. See *supra,* at 226–227, and n. 34. Even if it is assumed that some state legislatures believed that these plans are insurance, however, it still does not follow that provider agreements like the Pharmacy Agreements in this case were considered by Congress to be the "business of insurance."

Many aspects of insurance companies are regulated by state law, but are not the "business of insurance." Similarly, the enabling statutes in existence at the time the Act was enacted typically regulated such diverse aspects of the plans as the composition of their boards of directors, when their books and records could be inspected, how they could invest their funds, when they could liquidate or merge, as well as how they could purchase goods and services by entering into provider agreements.

Provider agreements are no more the "business of insurance" because they were regulated by state law at the time of the McCarran-Ferguson Act than are these other facets of the plans which were similarly regulated. If Congress had exempted the "business of insurance companies," then these aspects of the plans which are not themselves insurance as that term is commonly understood would nevertheless be arguably exempt. But since Congress explicitly rejected this approach, they are not within the exemption even though they are the subject of state regulation.

This Court has implicitly recognized that state regulation of a practice

## IV

It is well settled that exemptions from the antitrust laws are to be narrowly construed. *E. g., Abbott Laboratories* v. *Portland Retail Druggists Assn., Inc.,* 425 U. S. 1; *Connell Construction Co.* v. *Plumbers & Steamfitters,* 421 U. S. 616; *FMC* v. *Seatrain Lines, Inc.,* 411 U. S. 726; *United States* v. *McKesson & Robbins, Inc.,* 351 U. S. 305. This doctrine is not limited to implicit exemptions from the antitrust laws, but applies with equal force to express statutory exemptions. *E. g., Abbott Laboratories* v. *Portland Retail Druggists Assn., Inc., supra,* at 11–12 (the Nonprofit Institutions Act); *FMC* v. *Seatrain Lines, Inc., supra,* at 733 (§ 15 of the Shipping Act); *United States* v. *McKesson & Robbins, supra,* at 316 (the Miller-Tydings and McGuire Acts).

Application of this principle is particularly appropriate in this case because the Pharmacy Agreements involve parties wholly outside the insurance industry. In analogous contexts, the Court has held that an exempt entity forfeits antitrust exemption by acting in concert with nonexempt parties. The Court has held, for example, that an exempt agricultural cooperative under the Capper-Volstead Act loses its exemption if it conspires with nonexempt parties. *Case-Swayne Co.* v. *Sunkist Growers, Inc.,* 389 U. S. 384; *United States* v. *Borden Co.,* 308 U. S. 188. Similarly, the Court has consistently stated that a union forfeits its exemption from the antitrust laws if it agrees with one set of employers to impose a wage scale on other bargaining units. *Ramsey* v. *Mine Workers,*

---

of an insurance company does not mean that the practice is the "business of insurance" within the meaning of the McCarran-Ferguson Act. In both cases, *SEC* v. *Variable Annuity Life Ins. Co.,* 359 U. S. 65, and *SEC* v. *National Securities, Inc.,* 393 U. S. 453, the challenged conduct was regulated by the State Insurance Commissioner, but this Court held that the practices were not the "business of insurance."

401 U. S. 302, 313; *Mine Workers* v. *Pennington*, 381 U. S. 657, 665–666.[39]

If agreements between an insurer and retail pharmacists are the "business of insurance" because they reduce the insurer's costs, then so are all other agreements insurers may make to keep their costs under control—whether with automobile body repair shops or landlords.[40] Such agreements

---

[39] As the Court stated in *Pennington*, 381 U. S., at 665–666 (footnote omitted):

"[A] union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the antitrust laws could be made out on evidence limited to such union behavior. But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it had agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy."

[40] There is no principled basis upon which a line could rationally be drawn that would extend the McCarran-Ferguson Act exemption only to an insurer's agreement with providers of goods and services to be furnished to its policyholders—such as agreements with hospitals, doctors, lawyers, and the like. But assuming that such a line could rationally be drawn, to hold that even such provider agreements are the "business of insurance" is to ignore the language and purpose of the Act not to exempt the insurance industry as such from the antitrust laws.

Moreover, exempting provider agreements from the antitrust laws would be likely in at least some cases to have serious anticompetitive consequences. Recent studies have concluded that physicians and other health-care providers typically dominate the boards of directors of Blue Shield plans. Thus, there is little incentive on the part of Blue Shield to minimize costs, since it is in the interest of the providers to set fee schedules at the highest possible level. This domination of Blue Shield by providers is said to have resulted in rapid escalation of health-care costs to the detriment of consumers generally. See Skyrocketing Health Care Costs: The Role of Blue Shield, Hearings before the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce, 95th Cong., 2d Sess., 4–34 (1978) (remarks of Michael Pertschuk, Chairman, Federal Trade Commission).

would be exempt from the antitrust laws if Congress had extended the coverage of the McCarran-Ferguson Act to the "business of insurance companies." [41]   But that is precisely what Congress did not do.

For all these reasons, the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE, MR. JUSTICE MARSHALL, and MR. JUSTICE POWELL join, dissenting.

The McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U. S. C. §§ 1011–1015, renders the federal antitrust laws inapplicable to the "business of insurance" to the extent such business is regulated by state law and is not subject to the "boycott" exception stated in § 1013 (b).[1]   The single question presented by this case is whether the "business of insurance"

---

[41] It might be argued that some such agreements are exempt from the antitrust laws under the state-action exemption of *Parker* v. *Brown,* 317 U. S. 341.   But that exemption would exist because of the extent of state regulation and not because the agreements are the "business of insurance."

[1] Section 2 (b) of the Act, as set forth in 15 U. S. C. § 1012 (b), provides:

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended [15 U. S. C. 41 et seq.], shall be applicable to the business of insurance to the extent that such business is not regulated by State Law."

Section 3 (b), as set forth in 15 U. S. C. § 1013 (b), provides:

"(b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."

includes direct contractual arrangements ("provider agreements") between petitioner Blue Shield and third parties to provide benefits owed to the insurer's policyholders. The Court today holds that it does not.

I disagree: Since (a) there is no challenge to the status of Blue Shield's drug-benefits *policy* as the "business of insurance," I conclude (b) that some provider agreements negotiated to carry out the policy obligations of the insurer to the insured should be considered part of such business, and (c) that the specific Pharmacy Agreements at issue in this case should be included in such part. Before considering this analysis, however, it is necessary to set forth the background of the enactment of the McCarran-Ferguson Act.

I

*SEC* v. *National Securities, Inc.,* 393 U. S. 453, 459 (1969), recognized that the legislative history of the McCarran-Ferguson Act sheds little light on the meaning of the words "business of insurance." See S. Rep. No. 20, 79th Cong., 1st Sess. (1945); H. R. Rep. No. 143, 79th Cong., 1st Sess. (1945). But while the legislative history is largely silent on the matter,[2] it does indicate that Congress deliberately chose

---

[2] The Court argues that the silence with respect to agreements between insurers and third parties, coupled with the fact that Congressmen did discuss horizontal agreements between insurance companies, establishes by negative inference that third-party agreements were not considered "the business of insurance." There is, however, a compelling explanation for the lack of mention of provider agreements. As the Court has noted in several cases, see, *e. g., SEC* v. *National Securities, Inc.,* 393 U. S. 453, 459 (1969); *St. Paul Fire & Marine Ins. Co.* v. *Barry,* 438 U. S. 531, 538–539 (1978), the McCarran-Ferguson Act was a reaction to the decision in *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533 (1944). See *infra,* at 236–237. That case involved an organization of fire insurance companies, and much of the congressional discussion accordingly concerned alleged abuses by and regulation of such companies. See, *e. g.,* 91 Cong.

to phrase the exemption broadly. Congress had draft bills before it which would have limited the "business of insurance" to a narrow range of specified insurance company practices, but chose instead the more general language which ultimately became law.[3]

---

Rec. 1091–1092, 1479 (1945); 90 Cong. Rec. 6449–6455, 6527 (1944). Indeed, health insurers did not even participate in the hearings on the Act. See Joint Hearing before the Subcommittees of the Committees on the Judiciary on S. 1362 et al., 78th Cong., 1st Sess. (1943). Since fire insurers paid their policyholders cash indemnities, these companies had no reason to contract with third parties for the provision of goods or services. That fact fully explains the absence of discussion of such contracts in the congressional debates. Such absence no more indicates a congressional intent to exclude provider agreements from the "business of insurance" than does the absence of any mention of health insurance companies indicate a congressional intent arbitrarily to exclude all health insurance from the "business of insurance."

[3] S. 12, 79th Cong., 1st Sess. (1945), would have specified

"any agreement or concerted or cooperative action *between two or more insurance companies* for making, establishing, or using rates for insurance, rating methods, premiums, insurance policy or bond forms, or underwriting rules." (Emphasis added.)

See also § 4 (b) of a draft bill of the National Association of Insurance Commissioners, 90 Cong. Rec. A4406 (1944). A significant Senate floor debate with regard to such limiting bills is the following:

"MR. PEPPER. Would it not be better that those agreements, if there are such that are legitimatized, be identified in the statute?

"MR. O'MAHONEY. I quite agree with the Senator, and I endeavored to the very best of my ability to induce the committees of Congress to write into the law specific exemptions from the antitrust law, but I was unable to prevail in the Committee on the Judiciary and I was unable to prevail on the floor of the Senate." 91 Cong. Rec. 1444 (1945).

The Court challenges the conclusion that Congress intended to phrase the exemption broadly by referring to the legislative history of one obscure amendment to an early House version of the Act. *Ante,* at 222–223, n. 29. Closer examination of the short debate surrounding that amendment reveals only the Representatives' repeated expressions of their confusion over what the amendment meant. See 90 Cong. Rec. 6562 (1944) (remarks of Reps. Summers, Hobbs, and Fernandez).

The historical background of the statute's enactment, developed by the Court in *SEC* v. *National Securities, Inc.,* *supra,* provides the guide to congressional purpose:

"The McCarran-Ferguson Act was passed in reaction to this Court's decision in *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533 (1944). Prior to that decision, it had been assumed, in the language of the leading case, that '[i]ssuing a policy of insurance is not a transaction of commerce.' *Paul* v. *Virginia,* 8 Wall. 168, 183 (1869). Consequently, regulation of insurance transactions was thought to rest exclusively with the States. In *South-Eastern Underwriters,* this Court held that insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws, in particular, were applicable to them. Congress reacted quickly . . . [, being] concerned about the inroads the Court's decision might make on the tradition of state regulation of insurance. The McCarran-Ferguson Act was the product of this concern. Its purpose was stated quite clearly in its first section; Congress declared that 'the continued regulation and taxation by the several States of the business of insurance is in the public interest.' 59 Stat. 33 (1945), 15 U. S. C. § 1011. As this Court said shortly afterward, '[o]bviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance.' *Prudential Insurance Co.* v. *Benjamin,* 328 U. S. 408, 429 (1946).

"The . . . Act was an attempt to turn back the clock, to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation." 393 U. S., at 458–459.

See also *St. Paul Fire & Marine Ins. Co.* v. *Barry,* 438 U. S. 531, 538–539 (1978); 90 Cong. Rec. 6524 (1944) (Cong. Wal-

ter) ("[T]he legislation . . . is designed to restore to the status quo the position the insurance business of this Nation occupied before the Supreme Court recently legislated [in *South-Eastern Underwriters*]").

Since continuation of state regulation as it existed before *South-Eastern* was Congress' goal,[4] evidence of what States

---

[4] There can be no quarrel with the Court's statement, *ante*, at 220, and n. 24, that the McCarran-Ferguson Act was not intended to restore the law, *in all respects*, to what it had been before *South-Eastern Underwriters*. But the principal differences between pre-*South-Eastern* and post-McCarran-Ferguson law are irrelevant for purposes of this case, and do not detract from the Court's oft-repeated statement that the purpose of the Act was to preserve state regulatory schemes as they existed before *South-Eastern Underwriters*.

Before *South-Eastern*, insurance companies might boycott, coerce, and intimidate without violating federal antitrust statutes since insurance was not considered "commerce" and hence was beyond the reach of federal law. For the same reason, even unregulated insurance transactions were free from antitrust attack. Finally, Congress, because of the "commerce" problem, could not otherwise regulate insurance. None of these elements survived the decision in *South-Eastern*, and none was revived by McCarran-Ferguson. These differences between pre-*South-Eastern* and post-McCarran-Ferguson law were what Senator Ferguson had in mind when he answered "no" to Senator McKellar's question, cited by the Court, *ante*, at 220 n. 24, asking whether the effect of the Act was to re-establish the law as it stood prior to *South-Eastern*. This is revealed by quotation of Senator Ferguson's full answer to Senator McKellar.

"MR. FERGUSON. No. I would say that subsection (b), at the bottom of page 2, would allow the provisions of the Sherman Act to apply to all agreements or acts of boycott, coercion, or intimidation, and subsection 4 (a) would suspend the application of the provisions of the Sherman Act and the Clayton Act, insofar as States may regulate and tax such companies, until certain dates or until Congress may act in the meantime in respect to what Congress thinks should be done with the business of insurance." 91 Cong. Rec. 478 (1945).

These discrete differences between pre-*South-Eastern* and post-McCarran-Ferguson law are not applicable here, and do not conflict with the holdings of this Court's prior opinions that, with respect to *state-regulated*

might reasonably have considered to be and regulated as insurance at the time the McCarran-Ferguson Act was passed in 1945 is clearly relevant to our decision. This does not mean that a transaction not viewed as insurance in 1945 cannot be so viewed today.

> "We realize that . . . insurance is an evolving institution. Common knowledge tells us that the forms have greatly changed even in a generation. And we would not undertake to freeze the concep[t] of 'insurance' . . . into the mold [it] fitted when these Federal Acts were passed." *SEC* v. *Variable Annuity Life Ins. Co.,* 359 U. S. 65, 71 (1959).

It is thus logical to suppose that if elements common to the ordinary understanding of "insurance" are present, new forms of the business should constitute the "business of insurance" for purposes of the McCarran-Ferguson Act. The determination of the scope of the Act, therefore, involves both an analysis of the proximity between the challenged transactions and those well recognized as elements of "insurance," and an examination of the historical setting of the Act. On both counts, Blue Shield's Pharmacy Agreements constitute the "business of insurance."

---

insurance practices *not constituting boycotts,* McCarran-Ferguson was intended to preserve pre-existing state insurance regulation.

This analysis also explains, and renders irrelevant for this case, Congress' rejection of the "total" exemption bills cited by the Court, *ante,* at 218–219, and n. 21. Those bills, unlike the one that passed, would have exempted boycotts and unregulated transactions. It was this aspect of the "total" exemption bills to which the National Association of Insurance Commissioners objected. See 90 Cong. Rec. 8482 (1944). These bills were rejected not because of a decision to narrow the scope of the nonboycott activities to be exempted, but because Congress determined that the business of insurance should be exempted only where regulated by the States, rather than unconditionally.

## II

I start with common ground. Neither the Court, *ante,* at 230 n. 37, nor the parties challenge the fact that the drug-benefits policy offered by Blue Shield to its policyholders—as distinguished from the contract between Blue Shield and the pharmacies—is the "business of insurance." Whatever the merits of scholastic argument over the technical definition of "insurance," the policy both transfers and distributes risk. The policyholder pays a sum certain—the premium—against the risk of the uncertain contingency of illness, and if the company has calculated correctly, the premiums of those who do not fall ill pay the costs of benefits above the premiums of those who do. See R. Mehr & E. Cammack, Principles of Insurance 31–32 (6th ed. 1976). An important difference between Blue Shield's policy and other forms of health insurance is that Blue Shield "pays" the policyholder in goods and services (drugs and their dispensation), rather than in cash. Since we will not "freeze the concep[t] of 'insurance' . . . into the mold it fitted" when McCarran-Ferguson was passed, this difference cannot be a reason for holding that the drug-benefits policy falls outside the "business of insurance" even if our inquiry into the understandings of what constituted "insurance" in the 1930's and 1940's were to suggest that a contrary view prevailed at that time.[5]

Fortunately, logic and history yield the same result. It is true that the first health insurance policies provided only cash indemnities. However, although policies that specifically provided drug benefits were not available during the 1930's and 1940's, analogous policies providing hospital and medical services—rather than cash—were available.

The hospital service-benefit concept originated in Texas in

---

[5] See *SEC* v. *National Securities, Inc.,* 393 U. S., at 460 ("The relationship between insurer and insured, [and] *the type of policy which could be issued* . . . [are] the core of the 'business of insurance'"). (Emphasis added.)

1929; medical services were first offered in 1939. R. Eilers, Regulation of Blue Cross and Blue Shield Plans 10, 15 (1963) (hereinafter Eilers). In 1940, 4,500,000 people in 60 communities were covered by Blue Cross or related hospital-benefits plans. C. Rorem, Non-Profit Hospital Service Plans 1–2 (1940) (hereinafter Rorem I). During the 1940's, health insurance became a subject of collective bargaining, with unions demanding the service-benefit approach of Blue Cross and Blue Shield. S. Law, Blue Cross 11 (1974) (hereinafter Law). By 1945, the year the McCarran-Ferguson Act was enacted, over 20 million people were enrolled in service-benefit programs, with service-benefit plans comprising 61% of the total hospitalization insurance market. See Hearings before the Senate Committee on Education and Labor, A National Health Program, 79th Cong., 2d Sess., pt. 1, p. 173 (1946); Eilers 19; Law 11.

Moreover, regulation of the service-benefit plans was a part of the system of state regulation of insurance that the McCarran-Ferguson Act was designed to preserve. Led by New York in 1934, 24 States passed enabling Acts by 1939 which, while relieving the plans of certain reserve requirements and tax obligations, specifically subjected service-benefit plans to the supervision and control of state departments of insurance.[6] See Rorem, Enabling Legislation for Non-Profit Hospital Service Plans, 6 Law & Contemp. Prob. 528, 531, 534 (1939) (hereinafter Rorem II); N. Sinai, O. Anderson, & M. Dollar, Health Insurance in the United States

---

[6] See 1935 Ala. Acts No. 544; 1935 Cal. Stats., ch. 386; 1939 Conn. Pub. Acts, ch. 150; ch. 698, 53 Stat. 1412 (1939) (District of Columbia); 1937 Ga. Laws, p. 690; 1935 Ill. Laws, p. 621; 1939 Iowa Acts, ch. 222; 1938 Ky. Acts, ch. 23; 1939 Me. Acts, ch. 149; 1937 Md. Laws, ch. 224; 1936 Mass. Acts, ch. 409; 1939 Mich. Pub. Acts No. 109; 1936 Miss. Gen. Laws, ch. 177; 1939 N. H. Laws, ch. 80; 1938 N. J. Laws, ch. 366; 1939 N. M. Laws, ch. 66; 1934 N. Y. Laws, ch. 595; 1939 Ohio Leg. Acts, p. 154; 1937 Pa. Laws No. 378; 1939 R. I. Acts, ch. 719; 1939 S. C. Acts No. 296; 1939 Tex. Gen. Laws, p. 123; 1939 Vt. Laws No. 174; 1939 Wis. Laws, ch. 118.

48–49 (1946) (hereinafter Sinai); Comment, Group Health Plans: Some Legal and Economic Aspects, 53 Yale L. J. 162, 174 (1943). Another 16 States apparently limited the issuance of hospitalization insurance to stock and mutual insurance companies. Nine acted on the premise that the plans were not "insurance" and authorized operation under general corporation laws, exempt from reserve requirements. Rorem II, p. 532. By the time the McCarran-Ferguson Act was passed, 35 States had enabling legislation.[7] During this period, the National Association of Insurance Commissioners (NAIC), the organization of state insurance directors which played a major role in drafting the McCarran-Ferguson Act,[8] was also drafting model state enabling legislation to govern service-benefit health plans. Proceedings of the NAIC, 75th Sess., 226 (1944); id., 76th Sess., 250 (1945).[9]

---

[7] F. Hedinger, The Social Role of Blue Cross as a Device for Financing the Costs of Hospital Care 51 (1966). The additional statutes were: 1945 Ariz. Sess. Laws, ch. 13 (1st Spec. Sess.); 1939 Fla. Laws, ch. 19108; 1941 Kan. Sess. Laws, ch. 259; 1940 La. Acts No. 267; 1941 Minn. Laws, ch. 53; 1941 Neb. Laws, ch. 43; 1941 N. C. Pub. Laws, ch. 338; 1943 N. D. Laws, ch. 103; 1945 Tenn. Pub. Acts, ch. 98; 1940 Va. Acts, ch. 230; 1943 W. Va. Acts, ch. 8.

[8] See 91 Cong. Rec. 483 (1945) (remarks of Sen. O'Mahoney).

[9] Debate arose during this period as to whether service-benefit plans were technically insurance. See ante, at 225–230. Most state insurance commissioners ruled during the 1930's that the plans constituted insurance, and therefore had to meet the capital stock, reserve, and assessment requirements applicable to the commercial stock and mutual insurance companies which offered cash indemnity policies. Eilers 101. In addition, this meant that the plans were subject to special state taxation. Ibid. Such holdings limited the feasibility of the plans at a time when they were widely perceived as being socially beneficial. Moreover, it was argued that these rulings were inappropriate to service-benefit plans, which were generally "nonprofit," and often included guarantees by hospitals to provide services regardless of the financial state of the insurer—potentially an adequate substitute for the cash reserves needed by indemnity plans. Id., at 135–136, 239.

Some courts, and even some Blue Cross-type organizations, attempted to

Thus, when the McCarran-Ferguson Act became law, service-benefit plans similar to the Blue Shield plan at issue here were a widespread and well-recognized form of insurance, subject to regulation in most of the States. Congress itself treated these important programs as insurance. In 1939, Congress adopted an enabling Act incorporating a hospitalization-benefits plan in the District of Columbia, with supervi-

surmount these barriers to effectuation of plans deemed to be in the public interest by arguing that the plans were not technically "insurance" subject to the jurisdiction of state insurance commissioners, and hence were not bound by the requirements of the stock and mutual insurance companies. See, e. g., Jordan v. Group Health Assn., 71 App. D. C. 38, 107 F. 2d 239 (1939). But see Cleveland Hospital Service Assn. v. Ebright, 142 Ohio St. 51, 49 N. E. 2d 929 (1943) (hospital service plans are insurance); McCarty v. King County Medical Service Corp., 26 Wash. 2d 660, 175 P. 2d 653 (1946) (same). But contemporary commentators questioned the soundness of such views and argued that the plans should be treated as insurance, although as a special kind not subject to the traditional requirements. See, e. g., Note, The Legal Problems of Group Health, 52 Harv. L. Rev. 809, 815 (1939); Comment, Group Health Plans: Some Legal and Economic Aspects, 53 Yale L. J. 162, 172 (1943). The 35 state enabling Acts governing service-benefit health plans reflected the States' agreement that the plans were "a special type of insurance" differing from the stock and mutual companies. Rorem II, p. 534; Sinai 48. This is most clearly demonstrated by the fact that the vast majority of the state statutes, while relieving the plans of "other" insurance law requirements (primarily the reserve requirements and special insurance taxes), subjected their activities to the control of the state insurance commissioner. The 1939 New Mexico Statute, for example, amended the State's Insurance Code by adding a new section entitled "Non-Profit Hospital Service Plans." The amendment subjected the plans, and in particular both their premiums and rates of payment to hospitals, to the approval of the Superintendent of Insurance, while exempting them from "all other provisions of the insurance law." 1939 N. M. Laws, ch. 66 (emphasis added). This approach was in accord with the commonly held view that such plans were forms of "insurance," as reflected by the statements of numerous Congressmen in the congressional hearings on the proposed National Health Program, see infra, at 243. And everyday meaning, rather than some technical term of art, is what Congress intended by its use of the word "insurance" in the McCarran-Ferguson Act.

sory authority placed in the hands of the Superintendent of Insurance. See H. R. 6266, 76th Cong., 1st Sess. (1939); H. R. Rep. No. 1247, 76th Cong., 1st Sess. (1939); 84 Cong. Rec. 11224 (1939). And in hearings held the year after passage of the McCarran-Ferguson Act, the same Congress that approved that Act debated Blue Shield-type programs as alternatives to national health insurance, with participating Congressmen frequently referring to them as "insurance." Hearings before the Senate Committee on Education and Labor, A National Health Program, 79th Cong., 2d Sess., pt. 1, pp. 55, 83, 108, 172, pt. 2, p. 558 (1946).[10] The status of service-benefit policies as "insurance," both logically and historically, is therefore sufficiently established to make that the first premise in an analysis of the status of the Pharmacy Agreements at issue in this case.

## III

The next question is whether at least some contracts with third parties to procure delivery of benefits to Blue Shield's insureds would also constitute the "business of. insurance." Such contracts, like those between Blue Shield and the druggists in this case, are known as "provider agreements." The Court, adopting the view of the Solicitor General, today holds that no provider agreements can be considered part of the "business of insurance." [11] It contends that the "underwriting or spreading of risk [is] an indispensable characteristic of

[10] Messages of two Presidents to the Congress on the subject of national health care also referred to service-benefit plans as forms of insurance. Message from the President of the United States, Report and Recommendations on National Health, H. R. Doc. No. 120, 76th Cong., 1st Sess., 63 (1939); Message from the President, A National Health Program, H. R. Doc. No. 380, 79th Cong., 1st Sess., 9, 10 (1945).

[11] The respondents do not argue this view. They agree that some provider contracts may constitute the "business of insurance." Brief for Respondents 33.

insurance," *ante*, at 212,[12] and that "[a]nother commonly understood aspect of the business of insurance relates to the contract between the insurer and the insured." *Ante*, at 215. Because provider agreements neither themselves spread risk, nor involve transactions between insurers and insureds, the Court excludes them from the "business of insurance."

The argument fails in light of this Court's prior decisions and the legislative history of the Act. The Court has held, for example, *FTC* v. *National Casualty Co.*, 357 U. S. 560 (1958), that the advertising of insurance, a unilateral act which does not involve underwriting, is within the scope of the McCarran-Ferguson Act. And the legislative history makes it abundantly clear that numerous horizontal agreements between insurance companies which do not technically involve the underwriting of risk were regarded by Congress as within the scope of the Act's exemption for the "business of insurance." For example, rate agreements among insurers, a conspicuous congressional illustration, see, *e. g.*, 91 Cong. Rec. 1481, 1484 (1945) (remarks of Sens. Pepper and Ferguson), and the subject of the *South-Eastern Underwriters* case, see *SEC* v. *National Securities, Inc.*, 393 U. S., at 460, do not themselves spread risk. Indeed, the Court apparently concedes that arrangements among insurance companies respecting premiums and benefits would constitute the "business of insurance," despite their failure to fit within its formula. *Ante*, at 221 and 224–225, n. 32.

But the Court's attempt to limit its concession to horizontal transactions still conflicts with the legislative history. Compelling evidence is the fact that Congress actually rejected a proposed bill to limit the exemption to agreements between

---

[12] "Underwriting," the Solicitor General argues, means "spread[ing] risk more widely or reduc[ing] the role of chance events." Brief for United States as *Amicus Curiae* 17 (hereinafter Government Brief). For purposes of argument I will assume that this is a correct definition of "underwriting." But see R. Holtom, Underwriting Principles and Practices 11 (1973).

insurance companies. S. 12, 79th Cong., 1st Sess. (1945). See n. 3, *supra*. Moreover, vertical relationships between insurance companies and independent sales agencies were a subject of the indictment in *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 535 (1944), were the object of discussion in the House, 90 Cong. Rec. 6538 (1944) (remarks of Cong. Celler), and were expressly included as part of the "business of insurance" in an early draft of the Act, *id.*, at A4406 (NAIC bill, § 4 (b)(5)). Again, the Court concedes that such transactions, between insurers and agents, might fall within the "business of insurance," despite the inconsistency with the Court's own theory. *Ante*, at 224–225, n. 32.[13]

The Court's limitation also ignores the significance of pervasive state insurance regulation—prevailing when the Act was passed—of hospitalization-benefits plans whose "distinctive feature," Rorem I, p. 64; Proceedings of the NAIC, 75th Sess., 228 (1944), was the provider contract with the participating hospital to provide service when needed. The year prior to adoption of the Act the NAIC emphasized the relationship between provider agreements and service-benefit policies:

> "A hospital service plan is designed to provide service rather than to indemnify and this can only be guaranteed through contractual arrangements between plans and hospitals." *Ibid.*

The Association also proposed, in the year McCarran-Ferguson passed, a model state enabling Act requiring "full approval of . . . contracts with hospitals . . . by the insurance commissioner." Proceedings of the NAIC, 76th Sess., 250

---

[13] The effort to distinguish insurer/agent transactions from provider agreements on the ground that the former are "wholly intra-industry" while the latter are not, *ante*, at 225 n. 32, constitutes argument by tautology. The former are "intra-industry" and the latter not, only because the Court so holds today.

(1945). That proposal reflected well the actual contents of existing state enabling Acts which armed insurance commissioners with considerable authority to regulate provider agreements.[14] Congress itself authorized the service-benefit plan it incorporated in the District of Columbia "to enter into contracts with hospitals for the care and treatment of [its subscribers]." H. R. 6266, 76th Cong., 1st Sess. (1939). In light of Congress' objective through the McCarran-Ferguson Act to insure the continuation of existing state regulation, the conclusion that at least some provider agreements were intended to be within the "business of insurance" is inescapable.

Logic compels the same conclusion. *Some* kind of provider agreement becomes a necessity if a service-benefits insurer is to meet its obligations to the insureds. The policy before us in this case, for example, promises payment of benefits in drugs. Thus, some arrangement must be made to provide those drugs for subscribers.[15] Such an arrangement obtains

---

[14] See, *e. g.*, 1935 Cal. Stats., ch. 386; 1939 Iowa Acts, ch. 222; 1937 Md. Laws, ch. 224; 1939 Me. Acts, ch. 149; 1939 N. H. Laws, ch. 80; 1939 S. C. Acts No. 296. See also Rorem I, pp. 67–68; Sinai 48–49. Such provisions were often quite extensive, *e. g.*, requiring approval by the insurance commissioner of contracts between hospitals and the corporation, including rates of payment, *ibid.;* requiring that the contracts contain guarantees of services by the hospitals to policyholders despite financial difficulties of the insurer, Rorem I, p. 67; or even limiting the kind of hospitals with which contracts could be made, *id.*, at 68.

[15] Indeed, unions negotiating for drug-coverage plans have requested that the plans include contractual arrangements with pharmacies, in order to guarantee that the policy's promises are kept. See Brief for Motor Vehicle Manufacturers Assn. as *Amicus Curiae* 10–11.

It might be argued that the drug-benefits policy could operate successfully without any agreement between Blue Shield and the pharmacies. The consumer could simply pay the pharmacist his full price, whereupon he would normally receive the drugs without hesitation. Blue Shield could then reimburse the policyholder for the full price minus the $2 deductible. This would not, however, be the policy bargained for in this case. That

the very benefits promised in the policy; it does not simply relate to the general operation of the company. A provider contract in a service-benefit plan, therefore, is critical to "the type of policy which could be issued" as well as to its "reliability" and "enforcement." It thus comes within the terms of *SEC* v. *National Securities, Inc.*, 393 U. S., at 460. That case explained that the "business of insurance" involves not only the "relationship between insurer and insured," but also "other activities of insurance companies [that] *relate so closely* to their status as reliable insurers that they too must be placed in the same class." Thus, "[s]tatutes aimed at protecting or regulating . . . [the insurer/insured] relationship, *directly or indirectly,* are laws regulating the 'business of insurance.'" *Ibid.* (emphasis added).

The Congress that passed McCarran-Ferguson was composed of neither insurance experts nor dictionary editors. Rather than use the technical term "underwriting" to express its meaning, Congress chose "the business of insurance," a common-sense term connoting not only risk underwriting, but contracts closely related thereto.[16] Since Congress knew of service-benefit policies, and viewed them as insurance, it would strain common sense to suppose Congress viewed con-

policy guarantees provision of drugs upon a minimal $2 payment, without requiring the policyholder to advance the full price when the contingency of illness occurs—a time when he may not be able to afford the out-of-pocket payment. Moreover, such cash-reimbursement plans almost inevitably include payment ceilings, again distinguishing them from the full-coverage service plan bargained for in this case. See discussion, *infra,* at 252, and n. 20.

[16] The Court errs in its reading of *SEC* v. *Variable Annuity Life Ins. Co.,* 359 U. S. 65 (1959). There a "variable annuity" plan was held not to be "the business of insurance" because all risk remained on the policyholder and no underwriting of risk occurred. The key to *Variable Annuity* is that neither the agreement at issue nor *any* with which it was involved effectuated a transference of risk. *Id.,* at 71. That is not the case here, where the policyholder has successfully transferred his risk by trading his premium for the certainty of benefits in the event of illness.

tracts necessary to effectuate those policies' commitments as being outside the business it sought to exempt from the antitrust laws.

## IV

The remaining question is whether the provider agreement in *this* case constitutes the "business of insurance." Respondents contend that even if some contract between Blue Shield and the pharmacies is necessary, this one is not. Under the contract at issue, the druggist agrees to dispense drugs to Blue Shield's insureds for a $2 payment, and Blue Shield agrees to reimburse the druggist for the acquisition cost of each drug so dispensed. The pharmacy is thus limited to a $2 "markup." With support from the Court of Appeals, respondents argue that only the first half of the bargain is necessary for Blue Shield to fulfill its policy obligations. Those are fulfilled when Blue Shield binds the pharmacy to dispense the requested drug for $2. The second half of the agreement, the amount Blue Shield reimburses the druggist, is assertedly irrelevant to the policyholder. As an alternative to the existing plan, the respondents and the Court of Appeals suggest that Blue Shield could simply pay the pharmacist his usual charge (minus the $2 paid by the policyholder). The present plan, which limits reimbursement to acquisition cost and freezes the markup at $2, is said to set a "fixed" price. From this premise respondents argue that such fixed-price plans are "anticompetitive," and therefore not the "business of insurance."

Respondents' argument is directly contradicted by history. The service-benefit plans available when the McCarran-Ferguson Act was passed actually "fixed" more of the payment to their participating providers than does the plan here, which "fixes" only the markup. Those early plans usually paid established and equal amounts to their participating hospitals, rather than paying whatever each hospital charged. Rorem I, p. 64. Moreover, under the typical state enabling Act, those

payments were subject to the approval of the state department of insurance.[17] The 1937 Pennsylvania statute, for example, provided that "all rates of payments to hospitals made by such [service-benefit plan] corporations . . . and any and all contracts entered into by any such corporation with any hospital, shall, at all times, be subject to the prior approval of the Insurance Department." 1937 Pa. Laws No. 378. Therefore, as insurer/provider fee agreements were part of the system of state regulation which the McCarran-Ferguson Act sought to preserve, there is no historical reason to exclude Blue Shield's Pharmacy Agreements from the ambit of the exemption; there is instead a good historical reason for including them.

Nor does respondents' claim that the Pharmacy Agreements are "anticompetitive" exclude them from constituting the "business of insurance." The determination of whether Blue Shield's Pharmacy Agreements actually involve antitrust violations or are otherwise anticompetitive has been held in abeyance, pending final decision as to whether the agreements fall within the scope of the McCarran-Ferguson Act. But even if the agreements were anticompetitive, that alone could not be the basis for excluding them from the "business of insurance." An antitrust exemption by its very nature must protect some transactions that are anticompetitive; an exemption that is extinguished by a finding that challenged activity violates the antitrust laws is no exemption at all.

While this reason for excluding the Pharmacy Agreements from the circle of exempt provider agreements is unconvincing, there are substantial reasons, in addition to history, for including them within that circle. First, it is clear that the contractual arrangement utilized by Blue Shield affects its

---

[17] Sinai 49. See, e. g., 1937 Ga. Laws, p. 690; 1939 Iowa Acts, ch. 222; 1939 Mich. Pub. Acts No. 109; 1939 N. M. Laws, ch. 66; 1939 Tex. Gen. Laws, p. 123. The same is true of the modern state statutes. See Eilers 106–107.

costs, and thus affects both the setting of rates and the insurer's reliability. This is definitely a factor relevant to the determination of whether a transaction is within the "business of insurance." See *SEC* v. *National Securities, Inc.*, 393 U. S., at 460. See also *Proctor* v. *State Farm Mutual Automobile Ins. Co.*, 182 U. S. App. D. C. 264, 561 F. 2d 262 (1977). True, that factor alone is not determinative, for as argued by the Court, innumerable agreements, including the lease on the insurance company's offices, affect cost. This contract, however, has more than a mere incidental connection to the policy and premium. It is a direct arrangement to provide the very goods and services whose purchase is the risk assumed in the insurance policy. It is therefore integral to the insurer's rate-setting process, as the correlation between rates and drug prices in a drug-benefits policy is necessarily high. Moreover, the ability of state insurance commissioners to regulate rates, an important concern of the Act, is measurably enhanced by their ability to control the formulas by which insurers reimburse providers.[18] The same is true of state efforts to ensure that plans are financially reliable. See *Travelers Ins. Co.* v. *Blue Cross of Western Pennsylvania*, 481 F. 2d 80, 83 n. 9 (CA3 1973) (quoting the Pennsylvania Insurance Commissioner). This close nexus between the Pharmacy Agreements and both the rates and fiscal reliability of Blue Shield's plan speaks strongly for their inclusion within the "business of insurance." See generally *Proctor* v. *State*

---

[18] Indeed, some state insurance commissioners have made aggressive use of their authority over provider contracts as a means of controlling premium rates. See *Frankford Hospital* v. *Blue Cross of Greater Philadelphia*, 417 F. Supp. 1104, 1106 (ED Pa. 1976), aff'd, 554 F. 2d 1253 (CA3), cert. denied, 434 U. S. 860 (1977); State of Michigan, Commissioner of Ins., No. 77–R–101 (Mar. 3, 1977); State of Illinois, Dept. of Ins., Hearing No. 1607 (Apr. 8, 1977). This may also explain why the Federal Government, in programs in which it functions as a health insurer, requires that its provider agreements include specified fee formulas. See, e. g., 42 U. S. C. §§ 1395u, 1395x (v) (Medicare).

*Farm Mutual Automobile Ins. Co., supra,* at 271–272, 561 F. 2d, at 269–270.

Another reason, in addition to this nexus to basic insurance elements, also supports the conclusion that fixed-price provider agreements are the "business of insurance." Such agreements themselves perform an important insurance function. It may be true, as the Court contends, that conventional notions of insurance focus on the underwriting of risk. But they also include efforts to reduce the unpredictable aspects of the risks assumed. Traditional plans achieve this end by setting ceilings on cash payments or utilizing large deductibles. R. Mehr & E. Cammack, Principles of Insurance 222 (6th ed. 1976). Even if the insurer cannot know how often a policyholder might become ill, it can know the extent of its exposure in the event of illness. The actuarial uncertainty, therefore, is greatly reduced. A fixed-price provider agreement attempts to reach the same result by contracting in advance for a price, rather than agreeing to pay as the market fluctuates. The agreement on price at least minimizes the variance of the "payoff" variable, even if the probability of its occurrence remains an unknown. Indeed, if examined carefully, this function comes within the latter half of the definition of "underwriting" offered by the Solicitor General: "spread[ing] risk more widely or reduc[ing] the role of chance events." See n. 12, *supra.* Of course, the Pharmacy Agreements in this case do not totally control "the role of chance" in drug prices since acquisition costs may fluctuate even if "markup" is fixed, but they are at least an attempt to reduce the role of chance to manageable proportions.[19]

Moreover, a service-benefit plan which "pay[s] the cost . . . whatever it might be," as hypothesized by the Court of

---

[19] The pharmacist respondents would not be better off if Blue Shield set acquisition cost as well as markup. In that event they might not even meet the cost of their own outlays.

Appeals, 556 F. 2d, at 1381, would run grave risks of bankruptcy. Since it would expose the insurer to unknown liability, it would measurably increase the probability that an incorrect assessment of exposure would occur. This could lead to a failure to cover actual losses with premiums. Respondents argue that this fiscal-reliability problem could be solved by placing a dollar limit on benefits. But such a plan would be almost indistinguishable from a cash-indemnity policy. It would not be the full-service-regardless-of-price plan for which the policyholders bargained.[20] The Pharmacy Agreements are thus "other activities of insurance companies relate[d] so closely to their status as reliable insurers that they too must be placed in the same class." *SEC* v. *National Securities, Inc., supra,* at 460.

## V

The process of deciding what is and is not the "business of insurance" is inherently a case-by-case problem. It is true that the conclusion advocated here carries with it line-drawing problems. That is necessarily so once the provider-agreement line is crossed by holding some to be within the "business." But that is a line which history and logic compel me to cross. I would hold that the *concept* of a provider agreement for benefits promised in the policy is within the "business of insurance" because some form of provider agreement is necessary to fulfill the obligations of a service-benefit policy. I would hold that *these* provider agreements, Blue Shield's Pharmacy Agreements, are protected because they (1) directly obtain the very benefits promised in the policy [21] and therefore

[20] The plan here was "bargained for" in the literal sense. It had its origins in a 1967 collective-bargaining agreement between the United Auto Workers and the three largest domestic automobile manufacturers. Brief for Petitioners 6.

[21] The Solicitor General suggests that this test could be subverted by an insurer's decision to list all kinds of incidental and even unrelated

directly affect rates, cost, and insurer reliability, and (2) themselves constitute a critical element of risk "prediction."[22] The conclusion that these kinds of agreements are the "business of insurance" is that reached by every Court of Appeals except the Court of Appeals in this case.[23]

I would not suggest, however, that *all* provider agreements come within the McCarran-Ferguson Act proviso. Given the facts found by the District Court upon summary judgment, this is not a case where the petitioner pharmacies themselves conspired to exclude others from the market, and either pressured Blue Shield to go along, or were voluntarily joined by the insurer. See also Government Brief 13 n. 6. Such an agreement among pharmacies, itself neither necessary nor related to the insurer's effort to satisfy its obligations to its policyholders, would be outside the "business of insurance." An insurance company cannot immunize an illegal conspiracy by joining it. Cf. *Parker* v. *Brown,* 317 U. S. 341, 351–352

---

transactions in its policy. As with other forms of antitrust immunity, I have no difficulty concluding that "sham" arrangements should not be honored. Cf. *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127, 144 (1961); *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508 (1972).

[22] These factors together are sufficient to decide this case. I need not decide whether either would independently suffice, nor whether in the absence of these factors others might also be capable of bringing a provider agreement within the exemption.

[23] See *Proctor* v. *State Farm Mutual Automobile Ins. Co.,* 182 U. S. App. D. C. 264, 561 F. 2d 262 (1977), aff'g 406 F. Supp. 27 (DC 1975), cert. pending, No. 77–580; *Doctors, Inc.* v. *Blue Cross of Greater Philadelphia,* 557 F. 2d 1001 (CA3 1976), aff'g 431 F. Supp. 5 (ED Pa. 1975); *Frankford Hospital* v. *Blue Cross of Greater Philadelphia,* 554 F. 2d 1253 (CA3 1976), aff'g 417 F. Supp. 1104 (ED Pa.), cert. denied, 434 U. S. 860 (1977); *Anderson* v. *Medical Service of District of Columbia,* 551 F. 2d 304 (CA4 1977), aff'g 1976–1 Trade Cases ¶ 60,884 (ED Va); *Travelers Ins. Co.* v. *Blue Cross of Western Pennsylvania,* 481 F. 2d 80 (CA3), aff'g 361 F. Supp. 774 (WD Pa. 1972), cert. denied, 414 U. S. 1093 (1973).

(1943). Moreover, since in this case the Blue Shield plan was offered to all San Antonio pharmacies and was in fact agreed to by at least 12, I am not called upon to decide whether an exclusive arrangement with a single provider would be so tenuously related to providing policyholder benefits as to be beyond the exemption's protection. See generally *Proctor* v. *State Farm Mutual Automobile Ins. Co.*, 182 U. S. App. D. C., at 270 n. 10, 561 F. 2d, at 268 n. 10.[24]

Finally, the conclusion that Blue Shield's Pharmacy Agreements should be held within the "business of insurance"[25]

---

[24] Such an arrangement could not be suspect simply because it would be anticompetitive, see discussion, *supra*, at 249. Rather, that means of providing policy benefits might be regarded as so unnecessary, and so likely to have its principal impact on pharmacies rather than policyholders, as to cross the boundary line of what constitutes the "business of insurance." I intimate no view upon the question.

[25] The analogies to other antitrust exemptions referred to by the Court, *ante*, at 231–232, are inapt. It is true that as a general rule an "exempt" party loses its immunity when it makes an agreement that is outside the scope of the exemption. But that general rule has no application here unless one assumes what the respondents need to prove—that the Pharmacy Agreements are outside the scope of the McCarran-Ferguson Act. Reference to the cases under the Capper-Volstead Act is not helpful on the matter, as that Act limits its exemption to those who are "engaged in the production of agricultural products *as farmers, planters, ranchmen, dairymen, nut or fruit growers.*" 42 Stat. 388, 7 U. S. C. § 291 (emphasis added). As a result, this Court has held that agreements involving nonfarmers are not exempt. *National Broiler Marketing Assn.* v. *United States*, 436 U. S. 816 (1978). As the Court emphasizes, however, the McCarran-Ferguson Act exemption was not written in terms of "insurance companies," but extends instead to the "business of insurance." Hence, the participation of pharmacies does not automatically vitiate the exemption, as does the participation of nonfarmers in the Capper-Volstead "analogy."

Nor is reference to the labor exemption helpful to the Court. The quotation from *Mine Workers* v. *Pennington*, 381 U. S. 657, 665–666 (1965), cited by the Court, *ante*, at 232 n. 39, is in complete accord with what I would conclude here: "[A] union [read 'insurer'] may make wage

does not alone establish whether the agreements enjoy an exemption from the antitrust laws. To be entitled to an exemption, petitioners still would have to demonstrate that the transactions are in fact truly regulated by the State, 15 U. S. C. § 1012 (b), and that they do not fall within the "boycott" exception of 15 U. S. C. § 1013 (b). The District Court held for petitioners on both issues. Neither issue was reached by the Court of Appeals, however, in light of its holding that the contracts were not the "business of insurance." Accord-

---

[pharmacy] agreements with a multi-employer bargaining unit [a group of pharmacies] . . . . But . . . [o]ne group of employers [pharmacies] may not conspire to eliminate competitors from the industry and the union [insurer] is liable with the employers [pharmacies] if it becomes a party to the conspiracy." The labor exemption is a particularly poor analogy for the Court to stress because in yet another footnote, *Pennington* expressly approved a set of transactions virtually identical to those complained of in this case. Here, respondents contend that Blue Shield adopted a uniform fee policy, even though it may have suspected that some pharmacies would not be able to compete if required to limit their markup to that demanded by Blue Shield. There was, however, no additional evidence of a conspiracy among the participating pharmacies to drive out their less able brethren, which Blue Shield then joined. This was precisely the set of circumstances held by the *Pennington* Court to be *within* the scope of the exemption:

"Unilaterally, and without agreement with any employer group to do so, a union may adopt a uniform wage policy and seek vigorously to implement it even though it may suspect that some employers cannot effectively compete if they are required to pay the wage scale demanded by the union. The union need not gear its wage demands to wages which the weakest units in the industry can afford to pay. Such union conduct is not alone sufficient evidence to maintain a union-employer conspiracy charge under the Sherman Act. There must be additional direct or indirect evidence of the conspiracy." 381 U. S., at 665 n. 2.

Thus, the approach taken by the Court today does not merely "narrowly" construe "insurance" in accordance with our general practice. Rather, that approach actively discriminates between kinds of insurance, effectively confining "insurance" to traditional forms and effectively excluding forms that provide full-service coverage via provider agreements. It thereby places a significant obstacle in the path of the latter.

ingly, I would reverse the judgment of the Court of Appeals and remand the case for further proceedings.[26]

---

[26] The Court argues, *ante,* at 232 n. 40, that provider agreements may have anticompetitive consequences which could lead to escalation of health-care costs. The argument is not without force, but I must note that the very purpose of an antitrust exemption is to protect anticompetitive conduct. The argument, therefore, is better directed to the legislature, which has the power to modify or repeal McCarran-Ferguson, rather than to this Court. Referral to the legislators is particularly appropriate in this case, as the policy aspects may not be as one-sided as those painted by the Court. There is authority for the proposition that provider agreements, far from increasing costs, constitute an effective means for reduction in health-care prices and premiums. Council on Wage and Price Stability, Employee Health Care Benefits: Labor and Management Sponsored Innovations in Controlling Cost, 41 Fed. Reg. 40298, 40305 (1976). And the argument that "there is little incentive on the part of Blue Shield to minimize costs, since it is in the interest of the providers to set fee schedules at the highest possible level" overlooks the vital consideration that many if not most of these plans originate in collective-bargaining agreements where "the consumer power and negotiating expertise of organized labor" combine to "reduce the unit price of health services." *Ibid.* Control over provider agreements by state insurance commissioners constitutes a second "incentive" operating in the same direction. See n. 18, *supra.* Whether or not the potential anticompetitive impact of McCarran-Ferguson outweighs these positive effects on health-care costs is a judgment properly to be made by Congress.