**HCA HEALTH SERVICES OF VIRGINIA, INC., Plaintiff,**

v.

**AETNA LIFE INSURANCE COMPANY, Defendant.**

Civ. A. No. 92–574–A.

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 15, 1992.

William D. Iverson, Washington, D.C., for plaintiff.

Laura Graham Fox, John Bowers McCammon, Richmond, Va., for defendant.

## MEMORANDUM OPINION

CACHERIS, Chief Judge.

This matter comes before the Court on the parties' cross motions for summary judgment.[1] For the reasons discussed below, Defendant's motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED.

## I. BACKGROUND.

This matter is properly before this Court under the diversity jurisdiction prescribed by 28 U.S.C.A. § 1332 (West 1992). Plain-

---

1. The defendant has also filed a motion for stay of proceedings, which, because of this Court's disposition of the substantive motions, is dismissed as moot.

tiff HCA Health Services ("HCA"), a Virginia corporation, sued defendant Aetna Life Insurance ("Aetna"), a Connecticut corporation, alleging that Aetna has unlawfully excluded HCA from the Preferred Provider Organization ("PPO") that Aetna operates in the Northern Virginia area.

A PPO is a mechanism by which subscribers to the PPO, who are generally employers providing their employees with health benefits, attempt to manage the cost of health care by entering into contracts at advantageous prices with "preferred" or "network" health care providers, such as hospitals or physicians. The cost reduction stems from the fact that under the PPO arrangement, selected health care providers agree to charge lower rates on services provided to participants, in anticipation of attracting a greater volume of patients from those participant groups, as well as the higher probability of receiving payment on behalf of persons covered in conjunction with this arrangement, as compared with the public at large. PPO networks may be established and maintained by either employee benefit plans themselves, third-party administrators, or, as in this case, by insurance companies who offer PPO arrangements to their employee benefit plan customers. Thus, the PPO Plan in this case is simply an insurance product offered by Aetna to subscribing employee benefit plans.

For purposes of analysis, it is important to understand the specific nature of the Aetna PPO Plan ("Plan") at issue in this case. The Plan is offered by Aetna *only* to employee benefit plans. *See* Def.'s Mem. Supp. Summ. J., Am. Aff. of John Coyle, former Exec. Dir. of Aetna Health Manage-

ment at ¶¶ 4–6. The plan currently involves the employee benefit plans of over 250 employers, covering approximately 50,000 employees and their eligible dependents in the Northern Virginia/District of Columbia Metropolitan regions. *Id.* at ¶ 8.

Aetna administers all of these employee benefit plans under the federal Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* (1988) ("ERISA") as ERISA plans, with two exceptions. *Id.* at ¶ 8. The two exceptions are the plans sponsored by Frederick County, Maryland, and the Maryland National Capital Park and Planning Commission, both of which are government plans. *Id.*[2]

Several of the employee benefit plans participating in the Aetna PPO are self-insured, for whom Aetna then provides merely administrative services. *Id.* at ¶ 10. For the remaining participants, Aetna acts both as the insurer and administrator of the plan. *Id.* at ¶ 11. In both instances, however, the arrangement for delivering health care through the Aetna PPO remains the same, irrespective of whether Aetna also acts as the insurer. *Id.* at ¶ 12.

Plaintiff operates HCA Reston Hospital Center in Reston, Virginia, and was formerly a preferred health care provider for the Aetna PPO. On June 5, 1991, Aetna notified the hospital that effective December 31, 1991, Aetna was terminating the hospital's contract as a preferred provider under the Aetna run PPO Plan. HCA has sued alleging that this exclusion violates the Virginia Preferred Provider Statute. *See* Va.Code Ann. § 38.2–3407 (Michie 1992).[3] HCA claims that Aetna failed to

**2.** HCA also alleges, which Aetna denies, that the subscriber employee benefit plan offered by Loyola College is a church plan, based upon the college's affiliation with the Jesuit religious order. Because the parties agree that at least two government plans are involved in the Plan, this disputed fact is immaterial to the Court's resolution, and therefore does not need to be decided. *See infra* at 1137–39 & nn. 5–6.

**3.** The Virginia Preferred Provider Statute reads in full as follows:

A. One or more insurers may offer or administer a health benefit program under which the insurer or insurers may offer pre-

ferred provider policies or contracts that limit the numbers and types of providers of health care services eligible for payment as preferred providers.

B. Any such insurer shall establish terms and conditions that shall be met by a hospital, physician or type of provider listed in § 38.2–3408 in order to qualify for payment as a preferred provider under the policies or contracts. These terms and conditions shall not discriminate unreasonably against or among such health care providers. No hospital, physician or type of provider listed in § 38.2–3408 willing to meet the terms and conditions offered to it or him shall be excluded. Nei-

establish terms and conditions for participation in the PPO network as required under the Virginia statute. HCA also claims that Aetna wrongfully failed to negotiate or allow the hospital to meet reasonable terms and conditions for continued participation in the Plan.

## II. ANALYSIS.

When a party files for summary judgment,

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Where the party opposing summary judgment would have the burden of proof at trial, that party is entitled

> to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered.

*Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). Finally, summary judgment is appropriate as a matter of law if the nonmoving party fails to make a showing sufficient to establish the elements necessary to his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). With these legal parameters in mind, the Court proceeds to an analysis of the case at hand.

Aetna alleges that it is entitled to judgment as a matter of law because regardless of whether it violated the Virginia statute, the statute is preempted by ERISA. In order to decide whether the Virginia statute is in fact preempted, this Court must first decide whether the Virginia state law "relate[s] to" an employee benefit plan as that term is understood under ERISA. Secondly, if the Virginia statute does relate to an employee benefit plan, this Court must then decide whether the statute is nevertheless saved from preemption as a state law "which regulates insurance," as that phrase has also come to be interpreted under ERISA.

The relevant ERISA provision states in pertinent part that

> Except as provided in subsection (b) of this section, *the provisions of this subchapter* and subchapter III of this chapter *shall supersede any and all State laws insofar as they* may now or hereafter *relate to any employee benefit plan described* in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a) (emphasis added) ("Preemption Clause"). ERISA further states that

---

ther differences in prices among hospitals or other institutional providers produced by a process of individual negotiations with providers or based on market conditions, or price differences among providers in different geographical areas, shall be deemed unreasonable discrimination. The Commission shall have no jurisdiction to adjudicate controversies growing out of this subsection.

C. Mandated types of providers set forth in § 38.2–3408, and types of providers whose services are required to be made available and that have been specifically contracted for by the holder of any such policy or contract shall, to the extent required by § 38.2–3408, have the same opportunity to qualify for payment as a preferred provider as do doctors of medicine.

D. Preferred provider policies or contracts shall provide for payment for services rendered by nonpreferred providers, but the payments need not be the same as for preferred providers.

E. For the purposes of this section, "preferred provider policies or contracts" are insurance policies or contracts that specify how services are to be covered when rendered by preferred and nonpreferred classifications of providers.

Va.Code Ann. § 38.2–3407 (Michie 1992).

Except as provided in subparagraph (B), *nothing in this subchapter shall be construed to exempt* or relieve *any person from any law of any State which regulates insurance*, banking, or securities.

29 U.S.C. § 1144(b)(2)(A) (emphasis added) ("Savings Clause"). Thus, in the context of this case, the Preemption and Savings Clauses in ERISA combine to preempt the Virginia state law if it "relate[s] to any employee benefit plan," but not if the Virginia statute "regulates insurance" so that it is nevertheless saved from preemption. The Court therefore first turns to the issue of whether the Virginia statute is one that "relate[s] to any employee benefit plan" under ERISA.

ERISA defines the term "employee benefit plan" as an "employee welfare benefit plan." 29 U.S.C. § 1002(3). "Employee welfare benefit plan" is in turn defined as

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability....

29 U.S.C. § 1002(1). The provisions of ERISA apply to any employee benefit plan established or maintained by an "employer engaged in commerce or in any industry or activity affecting commerce." 29 U.S.C. § 1003(a)(1).

█ Applying these portions of ERISA to the facts in this case, it is clear that the Aetna PPO customers other than the previously mentioned governmental plans, all of whom are employers providing employee health benefit plans, are providing employee welfare benefit plans subject to regulation under ERISA. Therefore, if the Virginia statute "relates to" these plans as contemplated by ERISA, it will have met the first step toward preemption under ERISA.

The United States Supreme Court has repeatedly interpreted the words "relate

to" in this context as broadly as possible, emphasizing that " '[A] state law may 'relate to' a benefit plan, and thereby be preempted, *even if the law is not specifically designed to affect such plans, or the effect is only indirect.*' " *Morales v. Trans World Airlines, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2031, 2038, 119 L.Ed.2d 157 (1992) (emphasis added) (quoting *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 136, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990)). The Court has applied a common sense analysis to this issue, stating that

[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, *if it has a connection with or reference to such a plan....* To interpret [§ 1144(a) ] to preempt only state laws specifically designed to affect employee benefit plans would be to ignore the remainder of [§ 1144].

*Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983) (emphasis added).

As the Court has noted elsewhere, "[t]he pre-emption provision was intended to displace all state laws that fall within its sphere, even including state laws that are consistent with ERISA's requirements." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985). Thus, "ERISA makes clear that even *indirect state action* bearing on private pensions may encroach upon the area of exclusive federal concern.... ERISA's authors clearly meant to preclude the States from avoiding through form the substance of the pre-emption provision." *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 524, 101 S.Ct. 1895, 1907, 68 L.Ed.2d 402 (1981).

█ Thus, for a state law to "relate to" a benefit plan, as that phrase is understood within the ERISA context, it is enough that the state law has an indirect connection or impact upon an employee benefit plan, even though the law at issue may not have been directly intended to affect employee benefit plans.

Conceptually this can be appropriately analogized to the analytic process em-

ployed when deciding whether an activity relates to interstate commerce, such that the activity can be regulated by Congress under the Commerce Clause of the United States Constitution. It is now rudimentary law that an activity as seemingly unrelated to interstate commerce as a single farmer growing wheat solely for his own consumption in fact impacts interstate commerce, and thus comes within the scope of the limited federal powers. *See Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *see also New York v. United States,* —— U.S. ——, ——, 112 S.Ct. 2408, 2419, 120 L.Ed.2d 120 (1992) ("As interstate commerce has become ubiquitous, activities once considered purely local have come to have effects on the national economy, and have accordingly come within the scope of Congress' commerce power.").

Accordingly, under the Commerce Clause, the analysis simply asks whether the activity in some way affects interstate commerce, even if that effect is unintended or indirect. Likewise, in order to determine whether a state law relates to an employee benefit plan under ERISA, the state law need only have a slight, unintended, indirect effect upon employee benefit plans regulated by ERISA to be preempted. Given the breadth of this preemption, there can be little doubt that the Virginia law in this case "relate[s] to" employee benefit plans.[4]

The statute on its face purports to regulate "health benefit program[s] under which the insurer or insurers may offer preferred provider policies or contracts that limit the numbers and types of providers of health care services eligible for payment as preferred providers." Va.Code Ann. § 38.2–3407(A) (Michie 1992). Yet these preferred provider arrangements that the statute seeks to regulate are *precisely* the mechanism by which the ERISA regulated employee benefit plans seek to deliver their medical services to the covered employees. The statute specifically seeks to prescribe the manner in which these preferred provider plans may limit the numbers and types of providers of health care services under a health benefit program—namely, that the insurer or administrator of the health benefit program "shall not discriminate unreasonably against or among such health care providers." Va.Code Ann. § 38.2–3407(B) (Michie 1992).

The very pleadings in this case further demonstrate that the statute relates to, or bears indirectly upon, plans covered by ERISA. Aetna has chosen to use the Plan as the method of delivering medical care to the employees covered under the ERISA employee benefit programs. Yet HCA is seeking to use the Virginia statute to force Aetna to operate the plan differently. That HCA seeks to avail itself of the Virginia statute in an effort to change how the Plan is operated shows that the statute at the very least bears an indirect relationship to plans covered by ERISA, and therefore "relate[s] to" plans covered under ERISA, as that phrase has come to be broadly interpreted by the courts.

Under the above discussed Supreme Court precedent, it is irrelevant that the manner in which the statute relates to employee benefit plans is indirect, or that it was not specifically designed to regulate employee benefit plans. All that matters for preemption purposes under ERISA is that the statute indirectly affects, has a connection with, and therefore "relate[s] to," employee benefit plans covered by ERISA.

In response, HCA points to two ERISA provisions found at 29 U.S.C. § 1003(b)(1) & (2), which state that

The provisions of this subchapter shall not apply to any employee benefit plan if—

(1) such plan is a governmental plan (as defined in section 1002(32) of this title);

---

4. Given the above statements of the Supreme Court, it is difficult to see how section 38.2–3407 would *not* "relate to" employee benefit plans. Most importantly, as was observed by our brethren Judge Williams in *Stuart Circle Hosp. Corp.* *v. Aetna Health Management,* 800 F.Supp. 328 (E.D.Va.1992) (J. Williams), the Virginia statute strikes at the heart of, and therefore is at least indirect state action upon, employee benefit plans.

(2) such plan is a church plan (as defined in section 1002(33) of this title) with respect to which no election has been made under section 410(d) of Title 26.[5]

As was stated in the facts above, the parties are in agreement that two subscribers, namely Frederick County and the Maryland National Capital Park and Planning Commission, are governmental plans that are exempt from regulation under ERISA.[6]

HCA argues that where the Aetna Plan has been subscribed to by church and/or governmental employee benefit plans, with such "plans [being] explicitly exempted from ERISA, that therefore Virginia is free to regulate any PPO with which the sponsors of such plans contract." Pl.'s Mem. Supp.Summ.J. and in Opp'n to Def.'s Mot. for Summ.J. at 21. Tellingly, HCA cites to no cases in support of this argument.

This Court accepts as true the proposition that if the PPO was marketed *only* to exempted plans, that the PPO would therefore not "relate to" ERISA for purposes of preemption, because there obviously would be no ERISA plans affected by the Virginia statute. It is from this proposition, though, that HCA makes its illogical leap of faith to argue that because some of the plans administered by the PPO are exempt from ERISA, that therefore the Virginia statute does not relate to ERISA benefit plans for preemption purposes.

This argument confuses the question that must be decided. The question at hand is, "For purposes of ERISA preemption, does the Virginia statute relate to ERISA employee benefit plans?" The question is *not*, as HCA would ask, "Does

the statute relate *solely* to ERISA benefit plans?" The statute obviously also relates to many entities not regulated by ERISA, such as the health care providers on whose behalf it seeks to regulate the offering of preferred provider policies. That certain non-ERISA groups or plans are involved in the PPO arrangement does not negate the fact that the PPO also involves plans that clearly *are* covered by ERISA, and that the Virginia statute seeks to dictate to the PPO how it may accomplish its purpose.

Likewise, the language of the Virginia statute does not limit its impact to PPOs that administer only ERISA exempted plans, and this federal court cannot now write such a limitation in for HCA. That is the job of the Virginia legislature. ERISA asks only whether the state statute "relate[s] to" an ERISA covered employee benefit plan, and not also whether the statute relates *only* to those plans. Because in this case, as was decided above, the Virginia statute relates to ERISA plans, the statute is preempted, and that nexus is not diminished because other non-ERISA plans are also involved. For purposes of the "relate[s] to" test, the statute could *also* relate to as many non-ERISA plans as it wished—all that matters for purposes of preemption is that the Virginia statute does relate to plans that do fall under ERISA.

Furthermore, it is clear from the ERISA language quoted by HCA for support that the congressional intent was merely to exempt *plans* offered by churches or governmental entities from regulation by ERISA. There is no indication that Congress also intended to allow those specially exempted plans somehow to infect other covered

---

**5.** The internally referenced sections in turn provide as follows:

(32) The term "governmental plan" means a plan established or maintained for its employees by the Governments of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing.... (33)(A) The term "church plan" means a plan established or maintained (to the extent required in clause (ii) of subparagraph (B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.

29 U.S.C. § 1002(32) & (33)(A).

**6.** As was previously stated, the parties are in disagreement over whether subscriber Loyola College is a church plan based on its affiliation with the Jesuit religious order. Plaintiff's argument can be made solely on the basis of the presence of the two governmental plans, and therefore it is immaterial whether the Loyola College package is a church plan. Accordingly, this Court need not decide that issue, and the dispute does not prevent the Court from rendering summary judgment.

plans through their mere presence. Nothing in the provisions quoted by HCA or the case law indicates that exempted governmental or church plans become the "Viral–Agents–of–ERISA," making all other plans that they come into contact with also exempt.

If HCA's argument were taken to its extreme, all any employee benefit plan administrator need do to avoid the intricacies of ERISA is to administer exempted church or government plans in addition to ERISA plans that are also administered. If this interpretation were correct, it can safely be predicted that church and governmental employee benefit plans will suddenly have insurance companies clamoring about the temple gates in order to take them on, in order to avoid the application of ERISA to all other administered plans.

Thus, contrary to HCA's assertion, it is clear that Congress has simply chosen to regulate some plans, while leaving the church and government plans unregulated. Borrowing the language of the Supreme Court in a slightly different ERISA context, "[w]e are aware that our decision results in a distinction between" regulated and unregulated plans. *Metropolitan Life*, 471 U.S. at 746, 105 S.Ct. at 2393. "By doing so we merely give life to a distinction created by Congress ..., a distinction Congress is aware of and one it has chosen not to alter." *Id.* Whether all plans under the PPO are ERISA plans, or only some plans are ERISA plans, the Virginia statute still "relate[s] to" ERISA plans, and is therefore preempted.

Whereas this Court has determined that the Virginia statute at issue does "relate to" employee benefit plans covered under ERISA, the Court next turns to the issue of whether the Virginia statute "regulates insurance" so that it is saved from preemption.

The Supreme Court has alluded to two tests for purposes of determining whether under ERISA a state law regulates insurance so that it is saved from preemption. First is the "common-sense view of the matter," which simply looks to see if the statute on its face "regulat[es] the substan-

tive content of insurance contracts...." *Metropolitan Life*, 471 U.S. at 741 n. 18, 105 S.Ct. at 2390 n. 18. The alternate test examines whether the state law at issue regulates the "business of insurance" as that phrase has come to be understood in the cases interpreting the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–15 (1988). *Id.* 471 U.S. at 741–44 & n. 21, 105 S.Ct. at 2390–92 & n. 21.

■ Examining the statute at issue first under the common-sense analysis, it is clear that Virginia Code section 38.2–3407 does not in any way attempt to regulate the substantive content of insurance contracts. From a common-sense point of view, the substantive content of insurance contracts, and the statutory regulation thereof, is concerned with the relationship between the insurer and its insured, rather than relations between the insurer and third parties such as health care providers.

It is instructive for these purposes to compare the Virginia statute with the one examined by the Supreme Court in *Metropolitan Life*, 471 U.S. at 729 n. 11, 105 S.Ct. at 2384 n. 11, which the Court held *did* regulate insurance under the common-sense view, because it "regulate[d] the terms of certain insurance contracts." *Id.* 471 U.S. at 739, 105 S.Ct. at 2389. That statute specifically provided that

"Any blanket or general policy of insurance ... or any policy of accident and sickness insurance ... or any employees' health and welfare fund ... *shall, provide benefits for expense of residents of the commonwealth covered under any such policy or plan, arising from mental or nervous conditions....*"

*Id.* 471 U.S. at 729 n. 11, 105 S.Ct. at 2384 n. 11 (quoting Mass.Gen.Laws Ann. ch. 175, § 47B (West Supp.1985)). Thus, the Massachusetts statute dealt specifically with the relationship between the insurer and insured, and mandated that the insurance contracts offered must provide coverage for the described mental condition.

The Massachusetts statute in *Metropolitan Life* is easily contrasted with the Virginia statute in this case. Rather than addressing the relationship between the in-

surer and insured as described in the terms of the insurance contract, the Virginia statute addresses only the relationship between health care providers and the organizers of PPOs. The statute simply observes that *if* an insurer chooses to cover health care through a preferred provider arrangement, that it must then follow the requirements of the statute and choose preferred providers in a nondiscriminatory fashion, according to established terms and conditions.

The statute is completely unconcerned with the relationship between the insurer and its insureds as that relationship is described in the substantive provisions of the insurance contract; indeed, the statute in no way mandates or expresses any opinion whatsoever on the adoption of a preferred provider program. The statute is directed only to the relationship between the insurers and health care providers, and does not in any way contemplate regulation of the terms of the insurance contract. This statute deals with the method by which the insurer chooses its preferred providers, and leaves the regulation of policy terms to other sections. *See, e.g.,* Va.Code Ann. §§ 38.2–3408–38.2–3419.1 (Michie 1992) (Article 2 of the Virginia Insurance Code, entitled "Mandated Benefits").

In opposition, HCA points out that the statute reaches only insurers, and that it is contained in the insurance section of the Virginia Code. These observations, however, do not address the issue of what exactly it is that the statute intends to regulate. Although it is obvious that the statute regulates what insurers may do in terms of choosing preferred health care providers, the term "regulates insurance" for ERISA preemption purposes has become a term of art, and it is not helpful merely to point out that insurance *companies* will fall under the scope of the statute. The question is more narrowly that of whether the statute in question regulates *insurance,* and not simply whether insurance companies are involved. It is a question of in what capac-

ity they are involved. Under the Virginia statute, that capacity is as a chooser of preferred providers, and *not* in the capacity of an insurer dealing with its policyholders. Thus, under the common sense test, the Virginia statute cannot be said to regulate the substantive content of any insurance contract, and therefore does not regulate insurance for purposes of the ERISA Savings Clause.

Turning now to the cases interpreting the phrase "business of insurance" under McCarran–Ferguson, the Supreme Court has identified three relevant factors:

> *first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.

*Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 73 L.Ed. at 647, 102 S.Ct. 3002, 3009 (1982).

Under the first criterion, whether a practice has the effect of transferring or spreading a policyholder's risk, it should be noted that the Supreme Court in *Group Life & Health Ins. v. Royal Drug Co.,* 440 U.S. 205, 212, 99 S.Ct. 1067, 1074, 59 L.Ed.2d 261 (1979) (emphasis added), was careful to distinguish between

> the *obligations* of [an insurer] under its insurance policies, which insure against the risk that policyholders will be unable to pay ... during the period of coverage, and the *agreements* between the [insurer] and the participating [third parties], which serve only to minimize the costs [the insurer] incurs in fulfilling its underwriting obligations.[7]

In other words, according to the Supreme Court risk spreading is *not* to be confused with mere cost minimization.

For example, if an insurance company is able to reduce its costs of doing business by paying less for the paper upon which

---

**7.** *Royal Drug* involved an agreement between Blue Shield and pharmacies whereby the participating pharmacies filled the policyholder's prescriptions at cost plus two dollars. Under the policy, the insured was obligated to pay only the two dollars, and Blue Shield was obligated to the participating pharmacies for the cost of the drug. *Royal Drug,* 440 U.S. at 207, 99 S.Ct. at 1072.

the insurance policies are printed, presumably this savings is then passed on to the insureds in the form of lower premiums. This does not mean that additional risk has been spread simply because the insureds have now saved money by having to pay a lower premium. The Supreme Court in *Royal Drug* was careful to say that mere cost saving through smart business decisions, which does ultimately benefit the insureds as the consumers of the insurance company's product, it *not* the same as the spreading of *risk*, which benefits the insureds as *insureds*, not merely intelligent consumers. No more or less risk is spread by the paying of a high or low price on paper for printing policies.

■ Likewise, the present case is exactly analogous to *Royal Drug*, and makes it clear that the Virginia statute is not regulating the business of insurance insofar as it does not address the transferring or spreading of a policyholder's risk. The arrangements between insurers and preferred providers regulated under the statute are the means by which insurers minimize the costs it must charge to its insureds. The insurer examines the various health care providers and decides which ones can deliver the care required by the insurance contract at the lowest cost. Clearly this is cost minimization rather than risk spreading. Indeed, the policyholder is unconcerned with *which* providers receive contracts—the policyholder is concerned only that the contract itself is fulfilled. To analogize this case to the previous discussion, the PPO merely seeks a better price for its consumers, and passes the savings on by way of lower premiums. The spreading of risk remains unaffected.

Risk spreading is unaffected because, as to the policyholder, the degree of risk spreading accomplished is determined by two factors. First, by how many persons are members of the risk pool, so that the risk assumed by any individual policyholder bears an inverse relation to the number of members in the pool (i.e., the number of insureds). Secondly, by how great a risk each individual member represents to the pool, so that the amount of risk spread

between members of a pool also bears an inverse relation to how "dangerous" or prone to making a claim each member of the pool is. In other words, the amount of risk spread by each policyholder is much less if that policyholder is a member of a small risk pool comprised primarily of persons requiring frequent and expensive health care, as compared to the greater risk spread by a policyholder who is a member of a large risk pool with healthy persons who never file claims.

What is important for these purposes is to understand that risk spreading is a question of examining the risk *pool*, and not a question of who *services* that pool. The amount of risk spread within any given pool remains the same whether the pool is serviced by Hospital X or Hospital Y. Thus, where the statute only regulates whether the provider will be Hospital X or Hospital Y, it does not have the effect of spreading or transferring risk.

As a response to the holding that under *Royal Drug* the Virginia statute does not involve the business of insurance, and as a return to the issue of ERISA preemption, HCA argues that it is precisely this finding that shows the Virginia statute does not "relate to" employee benefit plans, because the employees are basically unconcerned with *who* provides the health care, which is what the statute regulates. In addition to the obvious "apples and oranges" analytic difficulties present where HCA attempts to apply reasoning from *Royal Drug*, a case interpreting the McCarran–Ferguson Act, to the question of interpreting the phrase "relate to" in the completely unrelated ERISA statute, HCA's argument fails for another reason as well.

It is true, as has been observed by HCA as well as this Court, that the *employees* covered by the plans are unconcerned with *who* services the plans, so that the transferring or spreading of risk is not involved. This lack of concern, however, does not also mean that the statute does not "relate to" ERISA plans for *preemption* purposes. To the contrary, as was discussed above, the statute does relate to these plans because it has an indirect effect upon them

**1142**

by dictating how health care providers should be chosen. The low or nonexistent level of employee concern simply does not address the separate question of whether the statute relates to the ERISA plans for preemption purposes. Therefore, HCA's observation that employees are unconcerned with the identity of health care providers, although true, does not detract from the finding that the Virginia statute relates to employee benefit plans for purposes of preemption under ERISA.

Returning from this digression to the second factor examined to determine if the business of insurance is involved, namely whether the practice is an integral part of the policy relationship between the insurer and the insured, it is obvious from the previous discussion of the common-sense view that it is not. The statute regulates the formation and continuation of the relationship between the insurer and the *providers*, who are merely third-parties to the relationship between the insurer and insured. Again, applying the discussion of the Supreme Court in *Royal Drug* to the case at hand, it is clear as a matter of precedent that the "[preferred provider] agreements are not 'between insurer and insured.' They are separate contractual arrangements between [the insurer] and [health care providers] engaged in the sale and distribution of goods and services other than insurance." *Royal Drug*, 440 U.S. at 214, 99 S.Ct. at 1075.

Finally, turning to the third criterion, whether the practice is limited to entities within the insurance industry, it is also evident that under this test the statute does not regulate the business of insurance. As was discussed above, the statute regulates the relationship between insurers and providers of health care services, who are defined under the statute as a "hospital, physician or type of provider listed in § 38.2–3408...." Va.Code Ann. § 38.2–3407(B). Section 38.2–3408 in turn enumerates a list that includes such health field professionals as a "chiropractor, optometrist, optician, professional counselor, psychologist, clinical social worker, podiatrist, physical therapist, chiropodist, clinical

nurse specialist who renders mental health services, audiologist or speech pathologist." Clearly many, if not most, of these persons regulated by the statute are entities outside the insurance industry. Therefore, the statute is determined to not regulate the business of insurance under all three McCarran–Ferguson tests, and likewise ERISA.

### III. CONCLUSION.

To summarize, this Court has carefully examined Va.Code Ann. § 38.2–3407 and determined that under ERISA the statute at the very least indirectly bears upon, and therefore relates to, employee benefit plans covered by ERISA, and is preempted by ERISA as prescribed by Congress. Furthermore, because the statute does not regulate insurance, or the business of insurance, the statute is not thereby saved from preemption. On this basis it is clear that there are no disputes concerning genuine issues of material fact and that Aetna is entitled to judgment as a matter of law. Accordingly, summary judgment is granted in favor of defendant Aetna, HCA's cross motion for summary judgment is denied, and the case is dismissed with prejudice.