Argued and submitted November 9, 2001, affirmed July 10, 2002

LEGALCLUB.COM, INC.,
dba Legal Club of America,
*Petitioner,*

*v.*

DEPARTMENT OF CONSUMER AND
BUSINESS SERVICES,
*Respondent.*

INS 99-11-022; A111024

50 P3d 1196

Christine Nesbit argued the cause for petitioner. With her on the briefs were James E. Mountain, Jr., and Harrang Long Gary Rudnick, P.C.

Daniel J. Casey, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

## KISTLER, J.

The Director of the Department of Consumer and Business Services issued a declaratory ruling that, because petitioner offers "legal expense plans" within Oregon, it is subject to the Legal Expense Organizations Act, ORS 750.505 *et seq.* Petitioner seeks review of that ruling. We affirm.

The relevant facts can be summarized briefly. Petitioner markets individual, family, and small business legal plans nationwide. In return for a small fee, petitioner guarantees that its participating attorneys will provide plan members with some legal services each month for no charge. For example, in return for slightly less than $25 a month,[1] a small business plan member is entitled each month to have a participating attorney write 10 initial collection letters, review five documents (up to 10 pages each document), make two initial calls, and write three initial letters on behalf of the plan member's business. Petitioner also guarantees that, if a small business plan member needs additional legal services, the participating attorney will charge no more than $89 per hour for out-of-court representation and $109 per hour for in-court work.

Petitioner does not pay participating attorneys the actual or reasonable cost of providing its plan members legal services. Rather, petitioner "represent[s] to participating attorneys that it will provide [them with] a stream of referrals" and also offers them the opportunity for a priority listing on a network attorney site.[2] To the extent that plan members receive legal services from participating attorneys over and above the "free" monthly services, the plan members are responsible for paying for those services. Finally, if a plan member does not receive either the free legal services or the discounted rates that petitioner guarantees, the member's

---

[1] A small business plan member pays $299.40 annually.

[2] Participating attorneys must pay a monthly fee to be listed on the network site. As participating attorneys, however, they receive a higher listing than non-participating attorneys and thus appear at the top of the list when a potential client conducts a network search.

only recourse against petitioner is to seek a refund of the annual membership fee.[3]

The Legal Expense Organizations Act requires organizations that offer "legal expense plan[s]" to register with the Director of the Department of Consumer and Business Services (DCBS) and to comply with certain other conditions. *See, e.g.,* ORS 750.535; ORS 750.585; ORS 750.685. The issue in this case is whether the individual, family, and small business legal plans that petitioner offers are "legal expense plans" within the meaning of the act. In analyzing that issue, petitioner argued below, and renews its argument on review, that the legislature intended to regulate only organizations that offer legal insurance. It did not intend, petitioner contends, to regulate organizations that do not pay attorneys for their services or reimburse plan members' legal expenses. Petitioner argues that, because it neither pays attorneys nor reimburses plan members for the cost of their legal services, it is merely a referral organization and not subject to the act.

■ Before turning to petitioner's argument, it is helpful to examine its premise. Petitioner characterizes itself as a referral organization that does not pay participating attorneys for providing services to plan members. Petitioner, however, does more than simply refer plan members to attorneys. It instead guarantees plan members that they will receive a moderate amount of "free" legal services every month in return for paying petitioner a minimal amount each month.[4] Moreover, although petitioner does not pay participating attorneys the actual or reasonable cost of the legal services

---

[3] Petitioner's guidebook, which forms part of the agreement between petitioner and its plan members, provides:

"The term 'guarantee' as used in this guidebook refers to the guarantee that Legal Club of America® will find and refer its members to an attorney that will abide by the fee schedule outlined herein. If Legal Club of America® cannot find such an attorney for a member, the member's only recourse is a refund of their membership fee."

[4] As noted, small business plan members pay slightly less than $25 a month, and individual and family plan members pay slightly less than $8.00 a month for fewer services.

they provide plan members, petitioner does pay or compensate participating attorneys in the sense that it provides them with a stream of referrals. To the extent that petitioner suggests that participating attorneys do not receive anything in return for agreeing to provide plan members with free legal services, that suggestion does not accurately describe the arrangement that petitioner has devised.[5]

With that background in mind, we turn to the text and context of the Legal Expense Organization Act. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). As noted, the act applies to organizations that offer "legal expense plan[s]." That phrase is defined as an

> "agreement between an organization and a person or a group of persons whereby legal services are to be provided to the person or group of persons as members, or whereby the persons as members are to be reimbursed for charges incurred for legal services, in consideration of a specified payment."

ORS 750.505(2). Under the plain language of the statute, petitioner's plans fall within the first dependent clause of the definition—agreements "whereby legal services are to be provided to the person or group of persons as members * * * in consideration of a specified payment." Each of petitioner's plans is an agreement by which "free" legal services are to be provided each month to plan members in return for a specified payment to petitioner.

Petitioner argues, however, that we should look to the second dependent clause to interpret the first clause's meaning. Noting that the second clause covers plans in which an organization agrees to reimburse members for the costs they incur for legal services, petitioner concludes that the first clause is implicitly limited to plans in which an organization undertakes to pay participating attorneys those same costs. There is some symmetry to petitioner's argument, but

---

[5] Although petitioner does compensate attorneys in the sense that it provides them with a stream of referrals, it does not act as an insurer; that is, petitioner's plans are not structured in a way that petitioner underwrites any risk. *See Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 US 205, 211, 99 S Ct 1067, 59 L Ed 2d 261 (1979) (explaining that, typically, the "primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk"). If anything, the risk is shifted to the participating attorneys.

it depends on reading words into the statute that the legislature omitted—a task that the legislature has instructed us not to do. *See* ORS 174.010; *PGE*, 317 Or at 611. Moreover, we note that petitioner does pay or compensate participating attorneys in the sense that it provides them with referrals, even if it does not pay them for the actual or reasonable cost of the legal services that they provide.

■    We also consider a statute's context at the first level of analysis. *PGE*, 317 Or at 611. After defining "legal expense plans," the legislature set out six exceptions to that definition. ORS 750.525. Two are relevant to the question presented here. The first provides that a "legal expense plan" does not include:

> "Referral of individual clients to an attorney to the extent that such referral is provided by a nonprofit lawyer referral service or public corporation such as the state or local bar association, so long as there is no charge for such referral."

ORS 750.525(3). If, as petitioner argues, the definition of "legal expense plans" applies only to plans offering legal insurance, there would be no need to except referral services from the definition. Not only does this exception undercut the premise of petitioner's argument, but excepting *nonprofit* referral services from the act implies that some for-profit referral services remain within the definition of "legal expense plans," at least to the extent that they also meet the terms of that definition. *See Frohnmayer v. SAIF*, 294 Or 570, 577-78, 660 P2d 1061 (1983).

A second exception bears on the analysis. It provides that the definition of "legal expense plans" does not include "[a]uthorized insurers offering legal expense insurance in this state." ORS 750.525(6). Petitioner argues that, because authorized insurers are regulated under another portion of the code, that exception demonstrates that the phrase "legal expense plans" both includes and is limited to nonauthorized insurers offering legal expense insurance. We agree that the exception suggests, as do other portions of the act, that traditional "legal expense insurance" offered by nontraditional insurers is one type of "legal expense plan." It does not necessarily follow, however, that it is the only type of legal expense plan that the legislature intended to regulate.

Rather, the legislature used one phrase, "legal expense plan," to describe the reach of the act and a different phrase, "legal expense insurance," to identify an exception to that reach. If anything, the legislature's use of those two different phrases suggests that "legal expense insurance" is a subset of "legal expense plan[s]."

Petitioner relies on other portions of the act to support its view that the statutory phrase "legal expense plan[s]" should be interpreted to mean traditional "legal expense insurance." It argues that, after defining the phrase "legal expense plan" and setting out exceptions to that definition, the legislature imposed requirements on organizations offering legal expense plans that are typically imposed on insurers. For example, it notes that ORS 750.685(1) provides that no legal expense plan shall be offered for sale in Oregon unless the organization offering it "is insured under an insurance contract that provides indemnification for the services under the plan * * * in the event of default of the organization." Petitioner argues that the legislature required insurance to protect consumers in case an organization could not pay participating attorneys for the cost of providing legal services. It follows, petitioner reasons, that the legislature intended that only organizations offering legal expense insurance would be subject to the act.

■ Petitioner's argument is questionable. As noted, petitioner compensates participating attorneys by providing them with referrals. If petitioner were unable to find attorneys willing to provide the free monthly legal services and discounted rates in return for referrals, the insurance required in ORS 750.685(1) would presumably allow its plan members to purchase comparable coverage.[6] After considering the text and context of the act, we conclude that they

---

[6] Petitioner also focuses on ORS 750.585, which specifies that an organization offering legal expense plans must enter into written agreements with the attorneys providing legal services to its plan members. The attorneys must agree to provide "plan services to plan members [through the anniversary date of the plan] whether or not the providing attorney has been or will be paid under the plan." ORS 750.585(2). Although petitioner argues that that subsection demonstrates that the act is limited to traditional insurance plans, it applies to petitioner's plan as well. If petitioner fails to provide the stream of referrals that it represented it would, those statutory provisions protect consumers by ensuring that petitioner's plan members will continue to receive free legal services and discounted rates until

favor DCBS's conclusion that petitioner's plans come within the terms of the act. We cannot say, however, that the definition of "legal expense plan," considered in context, is unambiguous.[7] We accordingly turn to the act's history to determine the legislature's intent. *PGE*, 317 Or at 611-12.

The legislature enacted what is now the Legal Expense Organization Act in 1989. Or Laws 1989, ch 331. The Director of the Department of Insurance and Finance at the time, Ted Kulongoski, testified before the Senate Business, Housing and Finance Committee in support of the bill. He explained that, historically, there had been two types of prepaid legal service providers in Oregon. The first were "professional casualty insurers," which provided comprehensive legal plans and were regulated under existing provisions of the Insurance Code, like any casualty insurer. The other was a nonprofit Oregon State Bar affiliate, Oregon Pre Paid Legal Insurance, Inc., which was designed to make access to attorneys more affordable and received "modest supervision" under the Legal Service Contractor laws enacted for that purpose in 1973. Testimony, Senate Committee on Business, Housing and Finance, SB 192, February 28, 1989, Ex B (statement of Ted Kulongoski).

Against that background, three changes in the prepaid legal services business prompted the introduction of the act: (1) Oregon Pre Paid Legal Insurance, Inc., had been dissolved; (2) "various non professional insurers [were seeking] entry into the prepaid legal services market place," offering "access plans providing only limited consultation"; and (3) "the traditional direct sales of prepaid legal expense insurance through licensed professional insurance agents" was increasingly "giving way to various competitive systems of financing and mass marketing." *Id.* Ex B at 1-2. Kulongoski explained that, in response to the diversification

---

their anniversary date. The other provisions on which petitioner relies as context are no more persuasive.

[7] We also conclude that this statutory phrase is, in the methodology of *Springfield Education Assn. v. School Dist.*, 290 Or 217, 224, 621 P2d 547 (1980), an "inexact term." "As to 'inexact terms,' the task of the agency, and ultimately of the court, is to determine what the legislature intended by using those words." *Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 354, 15 P3d 29 (2000).

of legal services plans and their marketing techniques, the act was intended to provide "a practical regulatory way to encourage the development and utilization of legal expense insurance plans with proper regulatory safeguards for the protection of the consumer." *Id.* at 2.

At various points in the legislative process, Kulongoski and Richard McGavock, a representative of the Insurance Division, testified about the types of groups they hoped to regulate through the proposed act. According to McGavock, the organizations attempting to enter the new market included "everything from purveyors of soap to dispensers of legal services, and everything in between." Tape recording, Senate Judiciary Committee, SB 192, April 18, 1989, Tape 119, Side A (statement of Richard McGavock). The Amway Corporation, for instance, offered through its distributors a prepaid legal services plan that, by its description, "provide[d] members immediate access to licensed attorneys in the member's state through a toll free 800 number; a limited number of personal hours of prepaid legal service; prepaid document review, will drafting and letter drafting; and guaranteed low hourly rates for [an] attorney's services beyond the prepaid services provided for by the plan." Senate Committee on Business, Housing and Finance, SB 192, February 28, 1989, Ex·D (letter from Amway Corporation to Jim Hill, Chairman).

Other plans were offered by groups that traditionally offered legal services, such as Hiatt Legal Services. Tape recording, Senate Committee on Business, Housing and Finance, SB 192, February 28, 1989, Tape 29, Side A (statement of Ted Kulongoski). Still other organizations were incorporated expressly for the purpose of selling prepaid legal insurance and marketed their plans by joining with financial institutions, like Citibank, or credit card corporations to offer free consultation or other "very limited legal services" as "just an entree to go with a myriad of other fringes that you get when you get your gold card or your special discount for Avis * * * it's part of a package." Tape recording, Senate Judiciary Committee, April 18, 1989, Tape 119, Side A (statement of Richard McGavock).

In confronting the potential regulation of such diverse plans, Kulongoski explained that the intent was to make the act broad enough to regulate what was a "new category" of insurers while encouraging responsible experimentation in the field. Tape recording, Senate Committee on Business, Housing and Finance, SB 192, February 28, 1989, Tape 29, Side A (statement of Ted Kulongoski). He added:

> "The fundamental approach * * * is to provide reasonably easy access to the field. There is currently an extremely wide variety of approaches and plans and also a wide variety in the nature of potential insurers. Accordingly, emphasis is placed on the regulation of the insurer rather than to restriction of form and nature of the plans."

Testimony, Senate Committee on Business, Housing and Finance, SB 192, February 28, 1989, Ex B at 3-4 (statement of Ted Kulongoski).

Kulongoski and McGavock also testified that the act was intentionally drafted broadly to avoid the sort of argument that petitioner makes, whether organizations like Amway or Hiatt qualified as "insurers" or not. Kulongoski explained that "[i]nstead of taking that battle on [in the past] we decided to wait until [this] legislative session and come before you and present this approach to regulate this particular aspect of the insurance industry."[8] Tape recording, Senate Committee on Business, Housing and Finance, SB 192, February 28, 1989, Tape 29, Side A (statement of Ted Kulongoski). McGavock emphasized in his testimony that the act was intended to be comprehensive. Tape recording, House Committee on Business and Consumer Affairs, May 23, 1989, Tape 144, Side A (statement of Richard McGavock). When Representative Schoon remarked that the act as

---

[8] The chair of the House Committee on Business and Consumer Affairs asked McGavock why providers of prepaid plans were as yet unregulated:

McGavock: "They profess that they are not selling insurance . . ."

Chair: "Because it's a prepaid deal?"

McGavock: " . . . they say it's a service contract."

Chair: "So, they're walking the fine line here a little bit?"

McGavock: "Exactly."

Tape recording, House Committee on Business and Consumer Affairs, SB 192, May 23, 1989, Tape 144, Side A.

described seemed aimed to protect consumers of what "sounds like a legal service plan, rather than actual insurance," McGavock emphasized that the bill was intended to address both types of plans. *Id.*

Amidst this legislative history, petitioner does not point to, nor can we find, any indication that the legislature intended to limit its understanding of a legal expense organization to only a specific type of insurer or insurance product, those in which an organization agrees to underwrite directly the costs of its members' legal fees. On the contrary, the legislative history demonstrates that the act was intended to expand insurance regulation to encompass new and various types of plans whereby legal services are provided in return for a specified payment to the provider. Having reviewed the legislative history, we conclude that petitioner's plans fall within the class of plans that the legislature intended to regulate. At a minimum, we cannot say that the Director's application of the act to petitioner's plans is inconsistent with the legislature's intent as expressed in the act's text, context, and legislative history. *See Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 354, 15 P3d 29 (2000) (explaining that courts "review the [a]gency's interpretation of inexact terms for consistency with legislative intent"). We accordingly affirm the Director's declaratory ruling that petitioner is subject to the Legal Expense Organizations Act.

Affirmed.